947 So.2d 48 (2006)
STATE of Louisiana
v.
Earl S. DAVIS.
No. 06-KA-402.
Court of Appeal of Louisiana, Fifth Circuit.
November 28, 2006.
*50 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Anne Wallis, Doug Freese, Trial Counsel, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Prentice L. White, Attorney at Law, Louisiana Appellate Project, Baton Rouge, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SUSAN M. CHEHARDY, and GREG G. GUIDRY.
GREG G. GUIDRY, Judge.
The Defendant, Earl S. Davis, appeals his convictions of second degree murder in violation of La.R.S. 14:30, and conspiracy to commit armed robbery in violation of La.R.S. 14:26 and 14:64. We affirm.
The Defendant was charged by indictment on August 21, 2003 along with his codefendants, Joseph Johnson and Shacira L. Marshall, with the second degree murder of Michael Pierre.[1] He was subsequently found guilty by a jury on May13, 2004. The Defendant's motion for new trial was denied, and on June 28, 2004, he was sentenced to life imprisonment at hard labor to be served without benefit of parole, probation or suspension of sentence for the second degree murder. He was sentenced to 49½ years imprisonment at hard labor for the conspiracy to commit armed robbery conviction to run concurrently with the murder conviction.
FACTS
On June 24, 2003, Michael Pierre (the victim) was found dead of gunshot wounds by his brother, Craig Pierre (Pierre) in his apartment on Holmes Boulevard in Gretna, Louisiana. The victim was shot once in the left side of his neck, and three times in the right side of his head.
Pierre had been with his brother until approximately 11:30 a.m. that day. Sometime before noon, Pierre's wife received a phone call from her brother, Hazel Harris, telling her to have Craig Pierre check on *51 Michael Pierre, because someone told Harris' ex-girlfriend that shots had been heard in the apartment. Harris was the victim's roommate. Pierre resided in the same apartment complex.[2] When Pierre went to the victim's apartment, he received no answer when he knocked on the door. He did not pursue the matter and went home. Around 4:00 or 5:00 p.m., Pierre was told by the victim's neighbor to go and check on his brother. When he peeked through the window of the apartment, he saw the victim sitting in a puddle of blood.
Donald Meunier of the Jefferson Parish Sheriff's Office investigated the crime. As part of the investigation, various people, including spectators at the scene of the police activity and in neighboring houses were questioned. As a result of the investigation, statements were taken from the next door neighbor, Shacira Marshall, Joseph Johnson, and the Defendant. Based on the statements taken from Johnson, Marshall and the Defendant, and two witnesses placing the Defendant at the complex on the morning of the shooting, the three were arrested and charged with the crime. According to Detective Meunier, no physical evidence was recovered linking the Defendant, Marshall or Johnson to the scene of the murder.
Detective Meunier testified that co-defendant Marshall lived next door to the victim in Apartment H-3 and the apartments shared an adjoining wall. His attention was drawn to Marshall, because she stated she was in her apartment and heard what could have been gunshots or cabinets slamming, but failed to contact the police. Instead, she called Lakesha Dupre, a former resident, and Harris' ex-girlfriend, although Dupre had moved out weeks earlier. In addition, she told the Detective that she came into contact with Johnson at 10:57 a.m., a very specific time, which was unusual. He found this particularly suspicious when Johnson gave the same exact time in his statement. The Detective said that most witnesses tend to round off times and do not pinpoint the times to the exact minute. The Defendant's name was not mentioned in Marshall's statement.
A few hours after the Detective interviewed Marshall, co-defendant Johnson arrived at the detective bureau. He gave four taped statements. The first two roughly paralleled Marshall's. Marshall and Johnson provided alibis for each other. They claimed they were in Marshall's apartment at the time of the gunshots and that they left there together.[3] In Johnson's two additional statements, he did not implicate himself as a participant in the murder, but gave significant details suggesting he was inside the apartment. Johnson accused Rodney Royal of being the killer. The Defendant's name did not come up in any of Johnson's statements. Detective Meunier found it troubling that Johnson also heard gunshots but did not call the police. Johnson had recently suffered *52 gun shot wounds and should recognize the sound according to Detective Meunier.
The Defendant was sought as a potential witness after the Detective received information from two people at the scene of the shooting suggesting the Defendant was at the apartment complex in the morning hours on the day of the murder. One witnesses referred to "Earl" and the other named the Defendant. Detective Meunier went to the Defendant's last known address and left a business card with his mother. The Defendant contacted him shortly thereafter by telephone and met him at the detective bureau within minutes. When asked to account for his whereabouts on the day of the incident, he gave an account which did not include his presence at the complex when witnesses had suggested otherwise. This inconsistency raised "red flags" and the Defendant was advised of his rights. The Defendant gave four taped statements which were played at trial, and the transcriptions of the statements were published to the jury.
After Detective Meunier spoke with the Defendant, Johnson was interviewed again and admitted he falsely accused Rodney Royal.
Defendant's Statements
In the Defendant's first statement, he denied being at the complex on the morning of the murder. He stated he woke up at his girlfriend's, Diamond Guidry's, house around 10:30 a.m. and called his friend Bolo. The Defendant claimed he did not leave Guidry's until 6:15 p.m. At that time, he went to Holmes Boulevard where the complex was located, and learned the victim had been shot and killed. While there, he talked to "Kyra" (Marshall) who lived in the apartment next to the victim's. Marshall told him she heard "cabinets slamming."[4] He stated that Joe (Johnson), who had a bullet wound in his left leg, told Marshall "I wasn't here."[5] The Defendant denied having contact with either Marshall or Johnson earlier in the morning.
Although in the Defendant's first statement he stated that he called his friend Bolo at around 10:30, at trial the Defendant said the call was around 5:00 p.m. However, Jeffrey Fleming, a Cox Communications employee, testified that the first call made from telephone number 301-1439 on June 24, 2003 was at 11:55 a.m. The Defendant admitted that this was Diamond Guidry's telephone number.
In his second taped statement, the Defendant implicated himself in the events leading to the murder. The Defendant said he arrived at Holmes Boulevard on the date of the accident in a Prism[6] and saw someone named Gilbert.[7] According to the Defendant, Johnson called to him to come up and "handle some business." Johnson said he wanted to go to the victim's apartment to borrow some money. While they were inside Marshall's apartment, the Defendant said that he heard Johnson tell Marshall to telephone the victim's apartment to make sure no one was there. Knowing the purpose of making *53 the call, Marshall called "Keisha,"[8] who "stayed" in that apartment. When Marshall found out that Keisha was not in the apartment, Johnson told Marshall to act as lookout to make sure nobody came and if someone did to "holler or something." They then went to the victim's apartment. The victim answered the door, let them in, and told them to close the door, because he did not want anybody over there. The Defendant locked the deadbolt. Johnson pulled out a gun and pointed it at the victim asking him "where it's at." Johnson also told the Defendant to go upstairs and "look." The Defendant said that he searched for money, dope and "whatever." After looking through furniture drawers and underneath the mattress, the Defendant returned downstairs. The Defendant testified that before he reached the bottom, while standing on the steps, he heard three shots. The Defendant said that the victim was shot first in the head, spinning him to the left. The victim then fell to the ground in the kitchen. The Defendant stated that he saw the victim on his knees with his hands up in the air begging for his life, and that the victim slumped down after the other shots were fired. After the shooting, the Defendant unlocked the apartment door, opened it, and ran into Marshall's apartment. Johnson was behind him. The Defendant claimed that Johnson told Marshall he shot the victim, because the victim saw Johnson's face. Approximately five minutes later, the three left the premises in the Prism. The Defendant drove Marshall and Johnson to his "Auntee's house," dropped them off, and left. According to the Defendant, he returned to the scene of the crime at 6:30 p.m. The police were there at that time.
The Defendant denied getting anything from the apartment. He identified Johnson in a photographic lineup as the shooter. The Defendant claimed he did not know Johnson's purpose in going to the victim's apartment, and did not know Johnson was armed until after the door was locked. He also said he knew Johnson was going into the apartment to borrow some money, but instead, Johnson ended up robbing the victim.
By the time of the Defendant's third taped statement, he had been arrested. Although he had indicated previously that he had no knowledge of why he was going into the apartment, he admitted in the third statement that he lied about the reason he went with Johnson. Defendant said he lied because he wanted to get some money, dope or "whatever." He also said he saw the shooting when he was three steps from the bottom of the stairs, and that he could see what was happening over the counter. When the Defendant was asked why he wanted to participate in this crime and what he hoped to get out of it, he said to "[g]et loaded, I was sick, hurtin (sic)."
In his fourth statement, the Defendant clarified his previous statement, and said that only he, the victim and Johnson were in the victim's apartment when the victim was killed.
Trial Testimony
Starla Michelle Fontenot testified that she and Diamond Guidry are employed by Rap's Luggage and Gifts. Fontenot does the payroll and Guidry worked from 9:03 a.m. to 4:53 p.m. on June 24, 2003. Both Fontenot and Guidry testified that Guidry drove her gold Prism to work that day, *54 thus, the Defendant would not have had access to the car during the day.
Timothy Scanlan, an expert in firearms identification, tool marks, bloodstain evidence analysis and crime scene investigation, testified that it appeared the shooting occurred within the kitchen area. He said it was likely that the victim was shot from the left side and received the first wound to his neck, and then spun to the ground from either the force of the shot, or was manipulated to a height of 22 inches. He was most likely on his knees or against the wall when he was shot three times in the head. After an examination of the recovered projectiles, it was determined that the shots were fired from the same weapon, a .38 caliber class weapon. No weapon was found.
Scanlan reviewed the Defendant's statement and said that the Defendant's description of the infliction of wounds and the positions of the victim's hands were consistent with the crime scene analysis and his findings. However, he testified that the Defendant could not have seen what he claimed to have seen from where claimed he was located at the time of the shots. Scanlan said the Defendant would have had to be at, or near, the kitchen area.
Detective Meunier also expressed doubt that Defendant could have seen the shooting from the location on the stairway, because he would not have been able to see below the kitchen counter. He had to be in the hall or near the kitchen.
Emily Rackley, the Defendant's ex-girlfriend, testified she was supposed to drive the Defendant somewhere that day. She went to the detective bureau to look for him after his mother told her he was giving a statement to the police. When she arrived, she met an officer who asked her about the incident. She told the police that the Defendant called her on the afternoon of the murder about 5:30 or 6:00 p.m. and asked if she had heard about it. He told her he was "out there" when it happened. He did not admit that he participated in the murder, but claimed that two people he knew living next door to the "guy" went over to this "guy's" house to rob him but shot him instead. Rackley said the Defendant told her he heard the gunshots.
At trial, the Defendant testified he woke up at Guidry's house about 11:30-11:40 a.m. on the day of the killing. He remembered using the telephone shortly after he awoke. The Defendant claimed he did not have access to a car that day, that no one picked him up, and he did not leave the house until 6:00 or 6:15 p.m. When he did leave, he took Diamond's car, a gold Prism. He drove to Holmes Boulevard where he observed police cars.
According to the Defendant, he spoke with Marshall and others at the scene. He said he called Rackley after 6:00 p.m. from a telephone on Holmes Boulevard and said "I'm here at the crime scene right now." He stated he had gotten the information he shared with Rackley from Marshall and Johnson. He denied telling Rackley that he heard gunshots and that he was on Holmes Boulevard when the murder happened.
The Defendant also denied killing the victim and stated he neither saw Johnson kill the victim, nor conspired with Johnson and Marshall to commit an armed robbery of the victim. He denied "hanging" out with Johnson and Marshall in the month leading up to the murder. When asked how a pawn ticket in his name dated June 20, 2003, four days before the murder, was found in Marshall's apartment, the Defendant responded he brought Marshall to the pawn shop because she wanted something, but did not have identification.
*55 The Defendant testified that only his first taped statement was true. He said the reason he gave the second statement was because the detective wanted him to be a witness and pressured him. The Defendant contended he was able to give a description of what happened from the information he was given by detectives. The Defendant said it was the detective's idea to say he participated in the crime, because he could not get enough dope. He also testified he was told to pick out Johnson's picture and write "Shooter" so he could be a witness.
Detective Meunier denied pressuring the Defendant. He further denied giving the Defendant a script to follow. He explained if he would have orchestrated such a scheme, he would have wanted the person to identify himself as a witness who saw and heard what happened, but did not participate in the incident.
ASSIGNMENT OF ERROR
On appeal, the Defendant asserts that the trial judge committed reversible error when he denied the Motion for New Trial despite the improper admission of clearly inadmissible hearsay evidence.
The Defendant argues that the new trial motion should have been granted, because the State illegally used hearsay evidence to substantiate the fact that he and his co-defendants, Marshall and Johnson, killed Michael Pierre after conspiring to rob him, and to show that at least one of them was armed with a dangerous weapon. The Defendant asserts the co-defendants were not called to testify during trial, and that the statements were admitted over his objection. Furthermore, he contends that the admission of hearsay evidence was not harmless error, because there is no independent evidence to establish he was present when the victim was shot or that he concocted a story with Johnson and Marshall to rob the victim at gunpoint.
The State responds the statements challenged by the Defendant were not offered for the truth of the matter asserted, but were explanations to the jury of the course of the police investigation, and were arguably made while participating in the conspiracy.
La.C.Cr.P. art. 851(2) provides that, on motion of the defendant, the trial court shall grant a new trial whenever "[t]he court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error." La.C.Cr.P. art. 851 states that a new trial motion "is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded." A trial judge's ruling on a motion for new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Benoit, 04-436 (La.App. 5th Cir.9/28/04), 885 So.2d 625, 632. Furthermore, absence a finding of an abuse of the trial judge's discretion, rulings on the admissibility of evidence will not be disturbed. State v. Mosby, 595 So.2d 1135, 1139 (La.1992); State v. Marshall, 02-747 (La.App. 5th Cir.2/11/03) 841 So.2d 866, 871.
Although the Defendant has assigned as error the denial of his motion for new trial based on hearsay objections, the Defendant actually extends this argument to include alleged hearsay testimony admitted at trial which is being challenged on appeal, but was not argued in his motion for new trial. The admission of this additional testimony will also be considered.
Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. arts. 801 A(1) and 801 C. Hearsay evidence *56 is not admissible except as otherwise provided by the Louisiana Code of Evidence or by other legislation. La.C.E. art. 802. Hearsay evidence is generally excluded, because the value of the statement rests on the credibility of the out-of-court asserter, who is not subject to cross-examination and other safeguards of reliability. State v. Smith, 03-866 (La.App. 5th Cir.11/25/03), 862 So.2d 240, 244, writ denied, 04-0050 (La.5/7/04), 872 So.2d 1078.
A police officer's testimony may include information provided by another person without constituting hearsay, if the testimony is offered to explain the course of the investigation and the steps which led to the defendant's arrest. State v. Cho, 02-274 (La.App. 5th Cir.10/29/02), 831 So.2d 433, 447, writ denied, 02-2874 (La.4/4/03), 840 So.2d 1213. The officer's testimony is not considered hearsay when he does not testify to the substance of what was told to him by another person, but rather what he did in response to that information. State v. Moses, 05-787 (La. App. 5th Cir.5/9/06), 932 So.2d 701, 711. In State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, 808, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000), the Louisiana Supreme Court stated:
Admission of information received by a police officer in the investigation of a crime, on the basis that such information explains the officer's presence and conduct and therefore does not constitute hearsay evidence, is an area of widespread abuse. Such information frequently has an impermissible hearsay aspect as well as a permissible nonhearsay aspect, and the court in determining admissibility should balance the need of the evidence for the proper purpose against the danger of improper use of the evidence by the jury. The fact that an officer acted on information received in an out-of-court assertion may be relevant to explain his conduct, but this fact should not become a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule. [Citations omitted.]
The Court further explained:
Information about the course of a police investigation is not relevant to any essential elements of the charged crime, but such information may be useful to the prosecutor in "drawing the full picture" for the jury. However, the fact that an officer acted on information obtained during the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant's guilt that would otherwise be barred by the hearsay rule.
Id. at 809. [Citations omitted.]
Statements of Marshall and Johnson
Detective Meunier testified that the statements made by the co-defendants raised his suspicions and caused him to act in certain ways during his investigation. This testimony was pertinent to drawing a "full picture for the jury." Because there was no physical evidence linking the Defendant and the co-defendants to the crime, it was necessary to explain what information led the detective to question them during the investigation. Detective Meunier further testified the interviews did not disclose any information about the Defendant. He only sought out the Defendant to question as a potential witness after being told by some people around the complex that he had been on the scene at the time of the shooting.
In State v. Cowart, 01-1178 (La.App. 5th Cir.3/26/02), 815 So.2d 275, 289, writ denied, 02-1457 (La.5/9/03), 843 So.2d 387, this Court held that a deputy's statements *57 were admissible, because they were necessary to explain the sequence of investigative events leading to the defendant's arrest. The deputy explained at trial that a witness had observed the defendant shoot the victim. When questioned by the deputy, the defendant provided an alibi. This Court explained that the deputy was merely telling the jury that the eyewitness testimony, coupled with the deputy's inability to confirm the defendant's alibi, led the deputy to arrest defendant for the victim's homicide.
In the present case, the references to the co-defendants' statements were not as closely related to the defendant's guilt as in Cowart, where we found the evidence admissible. In light of the fact that the co-defendants did not implicate the defendant, we conclude the State brought out the content of the statements only to show the progression of the investigation. Therefore, the evidence was not hearsay.
Nevertheless, even if some of the testimony was inadmissible hearsay and went beyond what was necessary to explain the steps taken in the investigation, the admission was harmless.
The erroneous admission of hearsay testimony is subject to a harmless error analysis. State v. Wille, 559 So.2d 1321, 1332 (La.1990), cert. denied, 506 U.S. 880, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992); Smith, 03-866 at 5, 862 So.2d at 245; State v. Antoine, 02-1068 (La.App. 5th Cir.2/25/03), 841 So.2d 874, 881. The proper inquiry is whether the guilty verdict rendered was surely unattributable to the error. Factors to be considered in making this determination include: 1) the importance of the witness' testimony; 2) the cumulative nature of the testimony; 3) the existence of corroborating or contradictory evidence regarding the major points of the testimony; 4) the extent of cross-examination permitted; and 5) the overall strength of the State's case. Antoine, 841 So.2d at 881.
The portions of the co-defendants' statements admitted at trial through Detective Meunier's testimony did not implicate the Defendant in the incident. Even if Marshall indicated that she was with the Defendant that day, as suggested by the Defendant in his brief, the Defendant admitted his presence in his taped statement, and Rackley testified that the Defendant told her he was present at the time of the shooting. In addition, the Defendant's statements tracked the statements made to Detective Meunier by Marshall and Johnson that Marshall lived next door to the victim and heard cabinets slamming or gunshots and did not call the police; that Marshall called Lakesha Dupre, to report what she heard; that Marshall and Johnson were together that day; and that Johnson had been shot previously and knew what a gunshot sounded like, but did nothing when he heard the sound. In Johnson's last two statements, he admitted being inside of the victim's apartment at the time of the shooting, but accused Rodney Royal of being the killer. The Defendant also said in his taped statements that Johnson was inside of the victim's apartment. The statements corroborate the Defendant's statements, and in his second statement, the Defendant implicated himself in the incident. Therefore, considering the Defendant's own taped statements and Emily Rackley's testimony, we find that the admission of the co-defendant's testimony was harmless, as the verdict rendered was surely unattributable to the error, if any. Further, Detective Meunier's testimony which referred to the co-defendants' statements was cumulative. The admission of a hearsay statement is harmless error if the statement is merely cumulative or corroborative of other evidence. *58 State v. Jones, 05-840 (La.App. 5 Cir. 3/28/06), 927 So.2d 514, 524.
Statements of "Gilbert" and unnamed individual
The Defendant argues that hearsay statements referred to by Detective Meunier from unnamed individuals who were not called to testify should not have been allowed at trial. However, although the record shows that the Defendant failed to object every time that Detective Meunier referred to the statements made to him during the investigation, the references corroborated the Defendant's own statements and the testimony of Emily Rackley.
In addition, the Detective explained that the information received from "Gilbert" and another person indicated that the Defendant might be a potential witness, because he was allegedly at the complex that morning. Detective Meunier stated that the Defendant was immediately advised of his rights once he denied being on Holmes Boulevard as the Defendant's statement conflicted with the witness accounts. The Defendant did not object to the testimony. Detective Meunier also clarified that the "Gilbert" referred to by the Defendant in his taped statement was one of the persons that informed him that "Earl" (the Defendant) was outside of the apartment that morning. Rather than objecting to the testimony at that point, defense counsel questioned the Detective about the witnesses he interviewed that placed the Defendant at the apartment complex that morning. When Detective Meunier told the court about Gilbert and his girlfriend, the State objected to the testimony as hearsay. The trial judge sustained the State's objection, and the Defendant objected to the trial judge's ruling that the testimony was inadmissible hearsay.
In the State's cross-examination of the Defendant, the Defendant testified that Detective Meunier told him that witnesses placed him at the complex on the morning of the murder. On rebuttal, the Detective said that he confronted the Defendant with that information after the Defendant denied he had been there. Thereafter, in a bench conference, defense counsel moved for a mistrial based on the testimony from Detective Meunier that some unknown person saw the Defendant on the premises, and that if the question was not referring to Gilbert, then she should be able to ask Detective Meunier to name the nontestifying witness, and be able to cross-examine that person. The motion was denied, and the Defendant noted his objection.
The Defendant did not object to the Detective's testimony in this regard until Detective Meunier was called on rebuttal by the State. Moreover, at trial, the defense attorney herself elicited the same testimony now complained of, and even objected when the judge refused to allow some of the testimony pursuant to the State's objection.[9] Under La.C.Cr.P. art. 841, an irregularity or error cannot be availed of after a verdict unless it was objected to at the time of the occurrence. When the objection is not made timely, there is no ruling for this Court to review. See, State v. Williams, 04-608 (La.App. 5th Cir.11/30/04), 889 So.2d 1093, 1100, writ denied, 05-0081 (La.4/22/05), 899 So.2d 559.
In addition, we note that, even considering the validity of the objection, the statements of nontestifying witnesses are cumulative of Rackley's testimony, and *59 the Defendant's own taped statements in which he admitted his presence at the scene of the murder at the time it was committed. Therefore, we find no merit to this argument.
Defendant's Statements to Emily Rackley
The Defendant argues that Emily Rackley's testimony placing him at the scene at the time of the shooting was also inadmissible hearsay. When Rackley testified at trial that the Defendant called her and asked if she had heard about the murder, he objected, but was overruled. According to Rackley, the Defendant told her he was on Holmes when it happened, and that two people he knew, who she described as "Joe and  I think her name is Kiara, or something," went over to this person's house to rob him, but instead shot him. We find this testimony is admissible. The Defendant was available and did testify to the contrary, and his own statements introduced into evidence corroborate Rackley's testimony. See, La.C.E. art. 801.
In conclusion, we find that the trial judge did not commit reversible error in allowing into evidence the testimony related to the statements made to Detective Meunier by Marshall, Johnson, the nontestifying witnesses, and Rackley. Therefore, the trial judge did not abuse his discretion in denying the Defendant's motion for new trial.[10]
Accordingly, the Defendants' convictions and sentences are hereby affirmed.
AFFIRMED.
NOTES
[1] The Defendant's trial was severed from his co-defendants.
[2] Hazel had received a phone call from Lakesha Dupre, a former roommate and girlfriend, who stated that someone had called her and said shots were heard.
[3] It is noted that the record is unclear as to whether Detective Meunier testified that Marshall indicated that she was in the Defendant's presence that day. The following testimony emerged when Detective Meunier was questioned regarding Johnson's statements:

Q: Did either he or Ms. Marshall indicate that they were in the presence of Earl Davis? I'm talking about in  I'm sorry. In the statement that you had taken from Shacira Marshall.
A: Uh-huh (affirmative response).
Q: And in any statement taken that day from Joseph Johnson; did Earl Davis' name come up?
A: No.
(R., pp. 267-268).
[4] The Defendant refers to "Kyra" and "Cira." From the context of these statements, it appears that he was referring to co-defendant Shacira Marshall.
[5] The Defendant also refers to "Joe" in his statements. From the context of these statements, it appears that he refers to co-defendant Joseph Johnson.
[6] The term "Prism" is sometimes spelled "Prizim" throughout the record.
[7] According to Detective Meunier, the person he referred to as Gilbert is one of the persons who informed him that "Earl" was outside of the apartment.
[8] It appears from the context of this statement and other testimony given that defendant is referring to Lakesha Dupre.
[9] See, State v. Cho, 831 So.2d at 447-448 where we held that the defendant was not entitled to relief, because he did not make a timely hearsay objection to the testimony and elicited the same information during his cross-examination.
[10] The record was reviewed for patent errors in accordance with La.C.Cr.P. art. 920. State v. Oliveaux, 312 So.2d 337, 338 (La.1975); and State v. Frazier, 03-1219, p. 8 (La.App. 5th Cir.3/30/04), 870 So.2d 1075, 1079; writ den. 04-1290 (La.10/29/04), 885 So.2d 584. We find no error requiring corrective action.