960 So.2d 296 (2007)
STATE of Louisiana
v.
John W. MATHIEU.
No. 06-KA-946.
Court of Appeal of Louisiana, Fifth Circuit.
May 29, 2007.
*298 Paul D. Connick, Jr., District Attorney, 24th Judicial District, Parish of Jefferson, State of Louisiana, Terry M. Boudreaux, Thomas J. Butler, Jay Adair, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee, The State of Louisiana.
Bruce G. Whittaker, Attorney at Law, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant, John W. Mathieu.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and FREDERICKA HOMBERG WICKER.
SUSAN M. CHEHARDY, Judge.
John W. Mathieu appeals his conviction by a jury of violation of La.R.S. 14:44.1, second degree kidnapping with a gun, and his sentence of thirty years at hard labor. We affirm conditionally, but remand for a hearing on whether the defendant properly waived his right to counsel.
On October 31, 2005, the Jefferson Parish District Attorney's office filed a bill of information charging John W. Mathieu (hereafter "the defendant") with the second degree kidnapping of his estranged wife, Terry Mathieu, a violation of La.R.S. 14:44.1. At arraignment the defendant pleaded not guilty. The defendant filed motions to quash and to dismiss, both of which were denied.[1]
*299 On June 13, 2006, a twelve-person jury found the defendant guilty as charged after a two-day trial. The defendant filed a pro se motion for post-verdict judgment of acquittal and a pro se amended motion for post-verdict judgment of acquittal, both of which the trial court denied.
On June 29, 2006, after waiving all delays, the defendant was sentenced to thirty years at hard labor, with the first two years of the sentence to be served without parole, probation, or suspension of sentence, to be concurrent with any other sentence.
The defendant objected to his sentence during the hearing and, on the same day, filed a timely motion for appeal on his conviction and sentence, which was granted. Subsequently the defendant filed a motion to reconsider sentence, which was denied.
FACTS
Terry Mathieu (hereafter "Ms. Mathieu") testified she is the defendant's ex-wife. She said they were married for twenty-three years, but separated on August 4, 2004 and were divorced in December 2004. According to Ms. Mathieu, from August 2004 until the date of the incident on July 16, 2005, the defendant constantly called her on the phone, sent her letters, and went to her place of employment, the Walgreens store at 678 Terry Parkway in Gretna, Louisiana. Eventually she stopped all contact.
On the date of the incident, Ms. Mathieu was working the 8:30 a.m.  5:00 p.m. shift, the same as she worked during her marriage to the defendant. After work, she walked to her vehicle, a Jeep Cherokee, carrying two bags. After she opened the vehicle's door, she was felt she was being pushed. She turned and saw it was the defendant. Instinctively she put her hand on the horn and blew it to get attention. She felt pressure on her lower back. The defendant told her, "Don't do anything stupid, I have a gun." He pushed her in the car and she saw he had a gun in his hand. It was "directed in [her] direction," but not pointed at her.
She denied that she got into the car voluntarily or that she voluntarily gave the defendant her car keys. Once she was in the car, she was crying and still trying to get attention from people in the parking lot. The defendant told her, "[S]ettle down. . . . I'm not going to hurt you. I just need to talk to you. You pushed me to this. You wouldn't talk to me." Ms. Mathieu described the defendant as nervous and sweaty. He drove them away from the parking lot.
Ms. Mathieu dialed 911 on her cell phone so that the emergency operator could listen to what was going on. As the defendant drove, he continued to shake the gun at her, telling her to "calm down, don't draw attention." During the recorded 911 conversation, the defendant threatened to kill himself. The defendant said he had pills that he was going to take to do himself in, and said he wanted Ms. Mathieu to stay with him until the end. When Ms. Mathieu asked the defendant why he brought a gun, he did not reply. Ms. Mathieu testified that the defendant never knew their conversation was being recorded.[2]
*300 With Ms. Mathieu in the vehicle, the defendant drove to Kiln, Mississippi. During the drive, as dusk was falling, Ms. Mathieu ended the 911 call because she was afraid that the defendant would see the light emanating from her cell phone as it got dark. Later, her cell phone rang and Ms. Mathieu answered it, at which point the defendant took the phone away from her.
During the course of the trip, the defendant "screamed" at her, accusing her of having sex with different men, breaking up their family, and taking everything away from him. He lay the gun in his lap, but occasionally picked the gun up as he was speaking and shook it in her direction.
Ms. Mathieu testified she was in the car with the defendant and the gun for three to four hours. They ended up at a rest stop in Kiln, Mississippi. After they arrived at the rest area, the defendant started screaming at her again, making accusations, and again saying he was going to kill himself. According to Ms. Mathieu, she did not have an opportunity to escape. At some point the defendant stopped to get gas, but Ms. Mathieu could not recall where, or whether it was before or after they reached Kiln. He told her not to do "anything stupid" while he went in to pay for the gas. He put the gun in the front of his pants. She saw that while he was paying for the gas, he continued to watch her. She was "scared" and didn't know if he would start shooting.
Later, the defendant drove Ms. Mathieu back to Gretna. She said that throughout the three or four hour trip with the defendant, she feared she would be killed. The defendant put a microcassette tape in the vehicle's console that the defendant claimed would explain everything. Ms. Mathieu testified that when the defendant turned off the car engine, she jumped out and ran because she was afraid he was going to kill her. She ran to a nearby McDonald's restaurant; when she got there she turned and saw the defendant walking down a side street. She locked herself in the restaurant's bathroom for a while. Later, she came out and looked around; after ascertaining the defendant was not around, she went to the pay phone and called her mother. The police eventually arrived at the restaurant and Ms. Mathieu's vehicle was towed to the detective bureau.
Ms. Mathieu said that after she fled the vehicle the defendant still had her keys to it, as well as her cell phone. She identified the defendant in open court as the man who took her at gunpoint on July 16, 2005 from Walgreens.
The defendant himself conducted the cross-examination of Ms. Mathieu. In response to his questioning, she admitted that prior to July 16, 2005 she was aware that he carried around a gun, and on July 16, he did not make any threats to her and she was not physically harmed, except for being pushed. She said he stuck the gun in her back.
Linh Pham, Ms. Mathieu's co-worker, testified she was employed at the Walgreens store located at 678 Terry Parkway on the date of the incident. Pham had just arrived in the Walgreens parking lot at 5:00 p.m. to start her shift, when she saw a man following Ms. Mathieu as Ms. Mathieu left the store. As Ms. Mathieu opened her car door, the man pushed her into the vehicle. Pham testified she could tell from Ms. Mathieu's expression that she was terrified. It appeared to Pham that Ms. Mathieu was probably screaming and trying to tell her something was wrong.
*301 Pham said that as she walked by Ms. Mathieu's vehicle, the defendant looked at her. Pham saw the defendant's full face, because the defendant stared directly into her face. The defendant drove away in the car, despite Pham's efforts to stop him. Pham described the five-minute incident as terrifying. She knew that something was terribly wrong. Pham told the manager that someone was "probably trying to kidnap somebody outside," and the manager called the police. Pham said she identified the man whom she saw push Ms. Mathieu into her vehicle and drive away in a photographic lineup.
Jane Trucksis, a Walgreens employee, testified that she called 911 on the date of the incident because a customer and Pham told her that Ms. Mathieu had been kidnapped. Trucksis identified her voice on the 911 tape played in court. On cross examination conducted by the defendant, Trucksis said she identified the defendant as the abductor in her 911 call because Pham told her it was him.
Detective Jeffery Rodrigue of the Jefferson Parish Sheriff's Office testified he responded to a call received from a Walgreens employee reporting that a co-worker named Terry Mathieu had been forced into a vehicle by an unknown Hispanic male. The caller thought Ms. Mathieu was in danger, because she screamed for help and blew the vehicle's horn to get the attention of people in the area.
When Detective Rodrigue arrived at the scene on Terry Parkway, he learned that several phone calls had come into headquarters from a phone number they later learned was Terry Mathieu's, on which the operator could hear a woman screaming hysterically and asking for help because someone was pointing a gun at her. In the course of the investigation, Detective Rodrigue spoke to Pham and to Troy Barrios, Ms. Mathieu's boyfriend, who had been called by someone at Walgreens. Detective Rodrigue learned that Ms. Mathieu and the defendant had an extensive history of emotional and violent abuse that included several incidents in which Ms. Mathieu was held against her will. Detective Rodrigue obtained an arrest warrant for the defendant.
Detective Rodrigue also learned that Ms. Mathieu had been driving a maroon Jeep Cherokee on the day of the incident. The vehicle was later located at the Home Depot on Stumpf Boulevard. Subsequently, Ms. Mathieu informed the police that the vehicle contained a cassette tape made by the defendant, which the defendant had directed Ms. Mathieu to listen to "after all this is over." The cassette tape was recovered from the Jeep's console. It was reviewed and found to be a message from the defendant detailing his intentions to commit suicide because of his separation from Ms. Mathieu.
Deputy Mark Layrisson of the Jefferson Parish Sheriff's Office testified that photocopies of the defendant's picture were given to local motels and hotels, as part of the investigation. The Sheriff's Office subsequently received a call from the Luxury Inn in Marrero reporting that there was a guest matching the suspect's description. When deputies arrived, they observed the defendant through a window. The deputies approached him, identified him by his driver's license, and placed him into custody. A search of the defendant revealed that he had a firearm. Deputy Layrisson identified the defendant in open court as the man that he had placed into custody that day.
Detective Sergeant Kelly Jones of the Jefferson Parish Sheriff's office testified that she obtained a statement from the defendant. Detective Jones said the defendant's statement did not match the *302 physical evidence obtained in the investigation.
In the defendant's statement, played for the jury, the defendant claimed that Ms. Mathieu started screaming after he startled her, as she opened the door of her vehicle. The defendant claimed that Ms. Mathieu jumped all the way into the passenger side of the vehicle over the center console and then she threw her keys at him. According to the defendant, Ms. Mathieu told him that she could not drive, because she was upset. The defendant claimed that he would have sat in the vehicle and spoken to Ms. Mathieu in Walgreens parking lot, but that she told him to drive.
The defendant said he got behind the wheel and drove toward Mississippi, while he spent the next thirty minutes trying to calm Ms. Mathieu down and assuring her she was not in danger. The defendant claimed Ms. Mathieu left with him voluntarily. The defendant said he took Ms. Mathieu to a Mississippi rest stop, where they talked. When they returned to Gretna, they parked at the Home Depot store on Stumpf Boulevard and talked again. The defendant said Ms. Mathieu then got out of the car and walked away, telling him to keep the Jeep. He claimed he called to Ms. Mathieu, telling her he still had her keys. Ms. Mathieu did not return, so he locked the vehicle's door. The defendant admitted seeing Ms. Mathieu run to McDonald's.
The defendant said he then bought a drink, sat in the park in Terrytown, and took some pills, which caused him to lose consciousness. He admitted, however, that he did not take the pills to kill himself. He said he only told Ms. Mathieu that he was going to take pills to kill himself because he was "messing with her." The defendant claimed the reason he still had Ms. Mathieu's cell phone when he was arrested was that Ms. Mathieu threw her cell phone at him during the incident, after he told her she could not call her son.
The defendant claimed that when he went to Walgreens that day, he did not have the nine millimeter semi-automatic gun later found on him during the search. He claimed that prior to going to Walgreens, he hid the gun under a concrete slab at the Terrytown Recreation Center tennis courts, and that he did not retrieve the gun until the next day. He said the gun belonged to his oldest son. He also said he never threatened Ms. Mathieu.
After the State completed presenting its case, the defendant rested his case without presenting any evidence.
ASSIGNMENT OF ERROR NUMBER ONE
The defendant asserts the trial court erred when it permitted him to represent himself.
The record reveals that the defendant was allowed to represent himself with the assistance of appointed counsel. The record does not contain any written motion by the defendant requesting to represent himself with or without the assistance of counsel, nor does it contain a ruling from the trial judge granting such a request. Similarly, the minute entries do not show that the issue of waiver of counsel was addressed at a pretrial hearing.
Nevertheless, the record is replete with pleadings filed by the defendant pro se, as well as pleadings filed by his appointed counsel. The minute entry for the first day of trial (June 12, 2006) states: "Previously the Court granted the pro se motion for the Defendant to represent himself. William Doyle will assist." The defendant's desire to represent himself was discussed by his appointed counsel, the trial judge, and the defendant prior to commencement *303 of the proceedings on both the first and second days of trial. The defendant conducted cross examination of most of the witnesses, and also made his own closing argument.
A defendant's right to the assistance of counsel is guaranteed by both our state and federal constitutions. State v. Brooks, 452 So.2d 149, 155 (La.1984), citing Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution give a defendant the right to counsel as well as the right to defend himself. State v. Bruce, 03-918, p. 4 (La. App. 5 Cir. 12/30/03), 864 So.2d 854, 857. "A defendant may represent himself only if he makes an unequivocal request to represent himself and knowingly and intelligently waives his right to counsel." Id., citing Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), and State v. Bridgewater, 00-1529 (La.1/15/02), 823 So.2d 877, 893, cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003).
Before accepting a waiver of counsel, the trial court should advise the defendant of the nature of the charges, the penalty range for the charges, and the dangers and disadvantages of self-representation, such as the failure to recognize objections to inadmissible evidence and the inability to adhere to technical rules governing trials. Bruce, 03-918 at p. 4, 864 So.2d at 857. In addition, the court should inquire into the defendant's age, education and mental condition, and should determine according to the totality of circumstances whether the accused understands the significance of the waiver. Id.
"Whether an accused has knowingly and intelligently waived his right to counsel is a question which depends on the facts and circumstances of each case." State v. Strain, 585 So.2d 540, 542 (La. 1991), citing Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).
A criminal defendant does not have the right to act both as "represented and representative" due to the potential for disruption of the trial process. State v. Brown, 03-897, p. 29 (La.4/12/05), 907 So.2d 1, 24, citing State v. Bodley, 394 So.2d 584, 593 (La.1981). However, "hybrid" representation does allow a defendant the right to defend himself as co-counsel while standby counsel explains and enforces the basic courtroom rules, as long as standby counsel participation does not seriously undermine the defendant's appearance as representing himself before the jury. Brown, 03-897 at pp. 28-33, 907 So.2d at 21-24.
A defendant performs the core functions of an attorney's traditional role when he formulates his own trial strategy, determines his own theory of the defense, chooses the witnesses to subpoena and to call to the stand, formulates the questions to be asked of the witnesses, and performs the opening and closing statements. State v. Dupre, 500 So.2d 873, 877 (La.App. 1 Cir.1986), writ denied, 505 So.2d 55 (La. 1987). An attorney functions in an advisory capacity when he is not the controlling strategist, but rather helps the defendant with procedural matters and proper courtroom conduct. Id.
When an attorney partially represents a defendant who assumes functions that are at the core of an attorney's traditional role, the defendant must still knowingly and intelligently waive his constitutional right to have his lawyer perform the core functions, in order to show that the defendant appreciates the possible consequences of mishandling the core functions that lawyers are more competent to perform. *304 Dupre, 500 So.2d at 877. "Therefore, when an attorney is appointed as an advisor the accused must knowingly abandon his right to be represented by counsel." Id.
Once the defendant has made a clear request to represent himself, the trial court must determine whether the defendant is competent to waive counsel and is voluntarily exercising informed free will. State v. Santos, 99-1897, p. 3 (La.9/15/00), 770 So.2d 319, 321. Only the defendant's competence to waive his right is at issue, not his competence to represent himself. Id.
"The judge, in accepting a waiver of counsel at trial, should advise the accused of the nature of the charges and the penalty range, should inquire into the accused's age, education and mental condition, and should determine according to the totality of the circumstances whether the accused understands the significance of the waiver." State v. Strain, 585 So.2d 540, 542 (La.1991), citing Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948). The trial judge's inquiry should involve more than "yes" or "no" questions and responses from the defendant, in order establish the defendant's intelligent and knowing waiver on the record. Id.
Because there are no inflexible criteria or a magic-word formula for determining the validity of a defendant's waiver of the right counsel, the inquiry into validity of the waiver must take into account the totality of the circumstances in each case. State v. Stevison, 97-3122, p. 2 (La.10/30/98), 721 So.2d 843, 845.
The trial court is given much discretion in determining whether the defendant's waiver was knowing and intelligent. State v. Mendez, 05-173, pp. 5-6 (La.App. 5 Cir. 1/17/06), 923 So.2d 189, 194. Since the trial court has had the opportunity to observe the defendant in court appearances and motions, the trial court is familiar with the defendant. Id. An appellate court should not reverse the trial court ruling absent an abuse of its discretion. Id.
As noted above, the record in this case contains no motion from the defendant requesting to represent himself, nor any ruling from the trial judge granting such a motion. However, the record does indicate that the defendant made such a request. The June 12, 2006 transcript refers to the trial judge's previous grant of the defendant's pro se motion to represent himself and with the assistance of counsel. Prior to jury selection on June 12, 2006 (the first day of trial), the defendant's appointed counsel, William Doyle, stated to the trial judge, "Your Honor, at this time I would like to proffer a few things on the record. Your Honor, first and foremost is that this Court granted Mr. Mathieu's motion for him to represent himself in this matter. I believe that's still a valid court order."
In the June 12, 2006 transcript, defense counsel acquiesced to his role in assisting the defendant. Defense counsel informed the trial judge that he had explained the concepts of evidence and courtroom procedure to the defendant, but counsel said he believed the defendant did not understand the concept of relevance, especially as it concerned his understanding of the charges against him. The trial judge then informed the defendant that if he wanted to represent himself with the assistance of counsel, he would be bound by the rules of evidence. The judge also told the defendant that representing himself was "a terrible idea." However, this statement by the trial judge apparently occurred well *305 after the defendant's request to represent himself had been granted.
The defendant stated that he had no problem with counsel representing him, if he was allowed to ask some questions of the witnesses during cross-examination. The trial judge informed the defendant he would not be allowed to proceed in that fashion; instead, he would be allowed to confer with his counsel about anything that he thought was missed or that he wanted to add. The defendant agreed they could proceed in that fashion. Subsequently, the matter was dropped without further discussion.
On June 13, 2006, the second day of trial, prior to commencement of the trial, defense counsel informed the court that the defendant would conduct portions of the trial, especially the cross-examination of the witnesses. The defendant personally cross-examined Ms. Mathieu, Pham, Trucksis, Detective Rodrigue, and Deputy Layrisson, with limited assistance from defense counsel. During the cross-examination of these witnesses, defense counsel requested and later reminded the court about the sequestration of witnesses, reviewed the evidence sought to be admitted by the State (i.e., the tapes of the 911 calls made by Ms. Mathieu and Trucksis), notified the court that the judgment of divorce sought to be admitted by the defendant was not certified, advised the court that witness Pham could be released, participated in an unrecorded bench conference, and informed the defendant about the procedures for the presentation of a document for use by a witness.
In addition, after a series of objections by the State and after receiving permission from the defendant, defense counsel offered a response to the State's objection to a lack of foundation concerning the defendant's questioning of Detective Rodrigue about a police report. Defense counsel acknowledged, in open court, that he was outside the scope of his assistance as standby counsel. The trial judge explained to the defendant that he would not be allowed to start a cross-examination and then have his defense counsel respond to any objections.
Defense counsel also reviewed the defendant's rights of arrestee form and the tape and transcript of the defendant's statement before they were admitted into evidence. In addition, defense counsel made objections during the testimony of Sergeant Jones and conducted cross-examination of that witness. Defense counsel conferred with the defendant before ending his cross-examination of Sergeant Jones.
Defense counsel also handled the discussion on jury charges, proffered into the record the defendant's decision not to testify, and rested the defense's case. The defendant gave his own closing statement.
The defendant contends the exchange shows that the trial judge failed to conduct a reasonable inquiry to determine whether the defendant's decision to represent himself was knowing and intelligent. The defendant claims the trial judge also failed to inform him of the nature of the seriousness of the charges, the penalty range, and the dangers and disadvantages of self-representation. In addition, the defendant claims the trial judge failed to inquire into his age, educational background, and mental health to ascertain whether, under the totality of the circumstances, he understood the significance of the waiver.
On the following day, during trial, the defendant apparently employed his own trial strategy based upon his own theory of the defense, asked questions of the witnesses he deemed relevant, and performed his own closing statementthereby performing the core functions of an attorney. *306 His appointed defense attorney took an advisory role helping the defendant with procedural matters and proper courtroom conduct, except for the cross-examination of Detective Jones.
The State argues that this assignment should be deemed abandoned, because the defendant has failed to provide this Court with a requisite complete record of the proceedings by which this Court could determine whether the trial court conducted a reasonable inquiry into whether the defendant's waiver of the right to counsel was knowing and intelligent. In the alternative, the State notes that the trial court, after having granted the defendant's request to represent himself, advised the defendant not to represent himself while addressing the dangers of self-representation and the rules of evidence.
It is impossible to discern from the record whether the trial court's inquiry was sufficient to determine whether the defendant's request to represent himself was clear and unequivocal and whether the defendant's competence to waive his right was knowing and intelligent. Nor can it be discerned whether the trial court's previous interactions with the defendant allowed the court to ascertain the defendant's mental and educational background, as argued by the State.
The State cites State v. Bruce, supra, suggesting that this Court should look at the June 12, 2006 colloquy while taking into account the totality of the circumstances in determining the validity of the defendant's waiver of his right to counsel. In that case the defendant was charged with possession of cocaine. On appeal, the defendant argued that that the trial court erred in allowing him to represent himself without determining that he knowingly and intelligently waived his right to counsel. Bruce, 03-918 at p. 3, 864 So.2d at 857.
In Bruce, the trial court advised the defendant that it could give him only limited help in taking advantage of the procedural laws, and even discussed the defendant's option under North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). In addition, the trial court reminded the defendant that appointed counsel could remain on the case and advise him on procedural matters. 03-918 at p. 6, 864 So.2d at 858. The Bruce trial court even recessed the proceedings to give the defendant an opportunity to think about his decision.
After the defendant again stated he wanted to defend himself, the trial court then reviewed the waiver of right to an attorney form executed by the defendant with him in open court. The form indicated defendant could read and write, and advised the defendant that an experienced attorney might know of certain defenses available or procedures that could result in the defendant's case being dismissed or the charges being reduced. The defendant was further advised that he would have to file his own motions, make his own objections, cross-examine witnesses at trial, and prepare his own defense, but that he had the right to have an attorney appointed to assist him. Id.
The defendant stated that he understood everything the trial court had reviewed before the trial court granted his request to represent himself. On appeal, this Court found that the defendant had knowingly and intelligently waived his right to counsel. Bruce, 03-918 at pp. 6-7, 864 So.2d at 858-859.
The State contends that, while the record does not establish the trial court specifically inquired into the defendant's age and mental condition as in other cases where the defendants eventually entered guilty pleas, the record shows the trial court had previously ascertained the defendant's *307 mental and educational background through numerous filings and court appearances in which the defendant sometimes spoke.
The failure of a trial court to secure a valid waiver of counsel constitutes reversible error. Bruce, 03-918 at p. 5, 864 So.2d at 857.
In State v. Drumgole, 31,294 (La.App. 2 Cir. 10/28/98), 721 So.2d 956, the defendant was charged with multiple felony counts. Before accepting his waiver of counsel, the trial counsel advised the defendant of the responsibility he was undertaking and explained some of the dangers and disadvantages. The court did not inquire about the defendant's understanding of the charges and the potential penalties he faced if convicted, nor did the trial court elicit any objective information about the defendant's age, educational background, mental competence, or his degree of familiarity with criminal law and procedure.
In Drumgole, the appellate court reversed the defendant's convictions, vacated his habitual offender adjudication and the sentences, and remanded the case for a new trial. 31,294 at p. 10, 721 So.2d at 961. The appellate court found that evidence in the record suggested that the defendant's waiver of counsel was voluntary, but showed no objective basis for assessing whether the waiver was knowing and intelligent; therefore, the appellate court concluded that the defendant's waiver of counsel was invalid. Id.
We find the present case distinguishable from Drumgole, supra. In this case, the defendant and the State refer to the defendant's previous waiver of his right to counsel, but the record does not contain that waiver.
In State v. Nanlal, 97-0786 (La.9/26/97), 701 So.2d 963, the issue was whether the defendant validly waived his right to a jury trial through counsel in open court and in his presence before trial. The supreme court vacated the judgment and remanded the case to the district court for an evidentiary hearing to determine whether the defendant had made a valid waiver of his right to a jury. 97-0786 at p. 1, 701 So.2d at 963. The supreme court held, "If the evidence shows that [the defendant] did not make a valid waiver of his right to a jury trial, the district court must set aside his conviction and sentence and grant him a new trial. [The defendant] may appeal from any adverse ruling on the waiver issue." Id.
The case of State v. Singleton, 05-622 (La.App. 5 Cir. 1/31/06), 922 So.2d 647, is analogous to the present situation. In Singleton, this Court found insufficient evidence to show a valid waiver of a jury trial. We conditionally affirmed the defendant's conviction and sentence. We pretermitted a final determination and remanded the case to the trial court to conduct an evidentiary hearing on whether the defendant validly waived his right to a jury trial, and for further proceedings, if necessary, pursuant to the holding in State v. Singleton. 05-622 at p. 12, 922 So.2d at 654.
In Singleton we ordered that if the evidence adduced at the hearing showed that the defendant did not make a valid waiver of his right to a jury trial, the trial court must set aside the defendant's conviction and sentence and grant him a new trial. Id. If, however, the evidence showed that the defendant validly waived his right to a trial by jury, the defendant's right to appeal from any adverse ruling on the waiver issue would reversed. In the absence of such an appeal, the defendant's conviction and sentence would be affirmed. Id.
Based on the foregoing, we conclude that the appropriate remedy in this case is to conditionally affirm the defendant's conviction *308 and to remand for an evidentiary hearing to determine whether the defendant made a clear and unequivocal request to represent himself and, if so, whether the trial court made sufficient inquiries into the defendant's competency before accepting the defendant's waiver of counsel as knowing and intelligent.
If evidence adduced at the evidentiary hearing shows that the defendant did not make a valid waiver of his right to counsel, the trial court must set aside the defendant's conviction and sentence and grant him a new trial. If the trial court finds that the defendant validly waived his right to counsel, however, the defendant's right to appeal that ruling should be reserved. In the absence of an appeal by the defendant, his conviction and sentence will be affirmed.
ASSIGNMENT OF ERROR NUMBER TWO
The defendant next asserts the trial court erred by imposing an excessive sentence.
In the present case, the defendant filed a Motion to Reconsider Sentence, in which he claimed his sentence was constitutionally excessive, because it was cruel and unusual punishment, a hardship to himself and his dependent twelve-year-old son, a retaliation for his refusing to accept a plea agreement, and was based on the trial judge's erroneous and prejudicial opinion of the defendant because of a prior acquittal for aggravated battery.
The defendant also claimed that his sentence was constitutionally excessive considering the statutorily-mandated minimum sentence for a second-degree kidnapping conviction by a first-time offender. In addition, the defendant claimed that the trial court did not afford his estranged sons and daughter-in-law the opportunity to speak on his behalf, and that his ex-wife previously had filed false charges against him and dropped them.
On appeal, however, the defendant argues only that his sentence of thirty years is excessive, because he is a first-time offender and is a father of four with a stable work history. He contends he was a stable, peaceful, and "productive member of society" prior to the dissolution of his twenty-three-year marriage to Ms. Mathieu, during which they had four sons. The defendant claims the circumstances that led to the criminal episode, which he admits frightened his ex-wife, were unique and will not recur, so that incarceration is not necessary to prevent a repetition.
The State argues that the trial court did not abuse its discretion. The State claims that the defendant's thirty-year sentence for second degree kidnapping was within the statutory guidelines and was one-quarter below the statutory maximum sentence allowed by law. The State contends there has been no showing that the defendant's sentence is disproportionate to the harm caused to society or that it shocks the sense of justice.
Trial judges have wide discretion in the imposition of a sentence. State v. Lefeure, 02-592, p. 5 (La.App. 5 Cir. 10/29/02), 831 So.2d 398, 402; State v. Hawkins, 99-217, p. 5 (La.App. 5 Cir. 7/2/99), 740 So.2d 768, 771. The sentence imposed by the trial court will not be set aside absent a showing of manifest abuse of that discretion. Lefeure, supra.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Wickem, 99-1261, p. 7 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, *309 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839.
In reviewing a sentence for excessiveness, the reviewing court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice. State v. Lobato, 603 So.2d 739, 751 (La.1992).
The three factors considered in reviewing a trial court's sentencing discretion are the nature of the crime, the nature and background of the offender, and the sentence imposed for similar crimes by the same court and other courts. State v. Knightshed, 00-1410, pp. 4-5 (La.App. 5 Cir. 3/28/01), 783 So.2d 501, 504-505; State v. Watts, 99-311, p. 6 (La.App. 5 Cir. 8/31/99), 746 So.2d 58, 64, writ denied, 99-2733 (La.3/24/00), 758 So.2d 145. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Allen, 03-1205, pp. 3-4 (La. App. 5 Cir. 2/23/04), 868 So.2d 877, 879-880.
The sentencing exposure for second-degree kidnapping is from five to forty years' imprisonment at hard labor, with at least two years of the sentence without benefit of parole, probation, or suspension of sentence. La.R.S. 14:44.1(C).
In the present case, the defendant received a sentence of thirty years, which is in the upper limits of the statutory maximum. Before sentencing the defendant, the trial judge said that during the course of the trial, it was clear to him that the defendant hadn't taken responsibility for his actions. The judge stated, "In fact, . . . not only have you failed to take responsibility for your actions, but you seemed to me that you could be potentially very dangerous if and when you get out of prison." The trial judge also noted that the defendant may have become emboldened to commit the acts in the present case after he was acquitted in a prior similar case.
In State v. Hawkins, supra, the defendant, a first time offender, appealed only the excessiveness of his thirty-year sentence for a second-degree kidnapping conviction. 99-217 at pp. 4-5, 740 So.2d at 770-771. Although the defendant was a first time offender, this Court noted that the defendant had a criminal background. Id. We found that the defendant's thirty-year sentence was neither an abuse of discretion nor constitutionally excessive, even when combined with his mandatory sentence of life imprisonment for aggravated rape. Id.
In State v. Washington, 95-771 (La.App. 5 Cir. 2/14/96), 670 So.2d 1255, writ denied, 98-0537 (La.9/25/98), 726 So.2d 7, the defendant was convicted of aggravated burglary, second-degree kidnapping, and carjacking. This Court upheld a forty-year sentence imposed on the first-time offender for the second degree kidnapping conviction. We found that the sentences imposed were not excessive. 95-771 at p. 12, 670 So.2d at 1262. In addition, we found that the concurrent sentences were not disproportionate to the offenses for which the defendant was convicted, nor did they amount to a purposeless and needless infliction of pain and suffering. Id.
In State v. Brock, 37,487 (La.App. 2 Cir. 9/26/03), 855 So.2d 939, writ denied, 04-1036 (La.4/1/05), 897 So.2d 590, the defendant was convicted of aggravated burglary and second degree kidnapping. The appellate court upheld a forty-year sentence imposed on the first time offender for the second degree kidnapping conviction. 37,487 at p. 12, 855 So.2d at 945. The appellate court found that there was an adequate, accurate, and factual basis for the trial court's imposition of maximum sentence *310 for the defendant's conviction of second degree kidnapping, because the crime was serious violation of the offense by the worst type of offender. Id.
Based on the record, we find the trial court did not abuse its great discretion in sentencing the defendant in the upper limits of the statutory maximum. The trial judge imposed the defendant's sentence after considering the defendant's prior violent history with the victim and his potential to become dangerous due to failure to take responsibility for his actions. Accordingly, we find no merit to this assignment.
ASSIGNMENT OF ERROR NUMBER THREE
The defendant has assigned as error "all errors patent." Our routine review of the record for errors patent, in accordance with La.C.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337 (La.1975), and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990), reveals none.
DECREE
For the foregoing reasons, the defendant's conviction and sentence are conditionally affirmed on the evidence in the record on appeal. However, a final determination of the appeal is pretermitted, and the case is remanded to the trial court to conduct an evidentiary hearing to determine whether the defendant made a clear and unequivocal request to represent himself and, if so, whether the trial court made sufficient inquiries into the defendant's competency before accepting the defendant's waiver of counsel as knowing and intelligent.
If the evidence shows that defendant did not make a valid waiver of his right to counsel, the district court must set aside his conviction and sentence and grant him a new trial. If, after the hearing, defendant is found to have validly waived his right to counsel, defendant may appeal from any adverse ruling on the waiver issue. In the absence of such an appeal, defendant's conviction and sentence will be affirmed.
CONVICTION AND SENTENCE CONDITIONALLY AFFIRMED; REMANDED FOR EVIDENTIARY HEARING.
NOTES
[1] The defendant sought writs from this Court on the denial of his motion to dismiss. We denied the writ application, finding no error in the trial court's ruling. On June 1, 2006, the defendant filed a subsequent motion to dismiss, but the record does not show the trial court ever ruled on it. Because the defendant proceeded to trial without raising the issue of the pending undecided motion, he waived the motion. See, State v. Gordon, 00-1013, p. 12 (La.App. 5 Cir. 11/27/01), 803 So.2d 131, 146, writs denied, 02-0362 (La.12/19/02), 833 So.2d 336 and 02-0209 (La.2/14/03), 836 So.2d 134.
[2] Ms. Mathieu identified the 911 tape in court, and it was played for the jury. A review of the 911 tape played for the jury reveals that Ms. Mathieu cried throughout most of the conversation with the defendant. During that conversation, Ms. Mathieu asked the defendant why he pulled a gun on her.