989 So.2d 120 (2008)
STATE of Louisiana
v.
Reginald BERRY.
No. 08-KA-151.
Court of Appeal of Louisiana, Fifth Circuit.
June 19, 2008.
*123 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Desiree M. Valenti, Walter Amstutz, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Katherine M. Franks, Attorney at Law, Louisiana Appellate Project, Springs, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and SUSAN M. CHEHARDY.
EDWARD A. DUFRESNE, JR., Chief Judge.
Defendant/appellant, Reginald Berry ("Berry"), appeals his conviction and sentence for possession of a firearm by a convicted felon, a violation of LSA-R.S. 14:95.1.
Berry pled not guilty at arraignment. Thereafter, his motion to suppress evidence and statement was denied. Berry proceeded to trial on July 19, 2007, following which the jury returned a verdict of guilty as charged. Berry was subsequently sentenced to fifteen years of imprisonment with the Department of Corrections without benefit of parole, probation, or suspension of sentence. The facts of the case are as follows.
Cynthia and Michael Armstrong ("Mr. or Mrs. Armstrong") and their children lived at 1813 Family Court in Marrero. On September 2-3, 2006, there was a FEMA trailer, in Mr. and Mrs. Armstrong's name, on their property in front of their home. Mrs. Armstrong's sister, Angenetta McGinnis, her children, Jasmine and Reginald, and Berry lived in the trailer. According to Mrs. Armstrong, she was charging her sister rent because of the use of utilities. Mr. Armstrong testified that they were not renting the trailer, but sometimes they did receive money.
On September 2, 2006, at around 6:30 or 7:00 p.m., Mr. Armstrong was outside barbecuing while Mrs. Armstrong was inside their residence. They both heard what sounded like a gunshot. After hearing the gunshot, Mrs. Armstrong went out to the trailer and opened the door. She looked at the ceiling where she saw many holes, and she asked Berry what happened. Berry was lying on the bed in the bedroom, and Mrs. Armstrong observed a gun on his side. Berry denied responsibility for the damage. Mrs. Armstrong also noticed a hole by the door frame near Berry. She explained that the trailer did not have those holes before this incident. When she entered, three children were also inside the trailer.
Mrs. Armstrong returned to her residence and told her husband what she had seen. Mr. Armstrong went to the trailer, and observed Berry in the bedroom, lying in the bed with a revolver next to him, while children were in the living room. He also noticed the holes in the wall, door, and ceiling. Berry told Mr. Armstrong that the gun went off accidentally. Mr. Armstrong believed the holes in the ceiling looked like scattered "buckshots" from a shotgun, but he only saw a handgun. He also noticed a shattered "vase lamp" in the *124 kitchen and testified that the damage was not there previously.
Although Mr. Armstrong asked Berry to put the gun away, Berry refused and kept it in his hand, stating that he could not explain what had happened. Berry pleaded with him not to call the police, but Mr. Armstrong believed Berry had not told him the truth and that someone could have been injured. Mrs. Armstrong called the police, but before they arrived, Berry left the trailer with a pillowcase. The responding officer walked around the trailer and ultimately left. Mrs. Armstrong called the police again when Berry returned.
Deputy Lance Williams ("Deputy Williams") of the Jefferson Parish Sheriffs Office and Team Leader of the SWAT Team responded to this second call and was one of the first officers to arrive. He learned from Mr. Armstrong that a gunshot had been fired inside the FEMA trailer by Berry and that he knew Berry was in the trailer with his family. Knowing family members were inside, an officer knocked on the door and tried to make contact. Although movements were heard inside, no one opened the door. The officers were concerned that hostages were inside the trailer. Minutes later, the trailer's door opened, and a female and two young children exited.
Being the only SWAT member on the scene at the time, Deputy Williams "covered" the door, which remained open. Deputy Williams yelled into the trailer numerous times. All information suggested Berry was still inside, but he was not responding, so Deputy Williams requested additional assistance of SWAT personnel and waited for additional tactical officers to arrive. They tried to communicate with Berry for hours. According to Deputy Williams, all of the family was out, so he believed time was on their side and that they would wait to avoid going into a "bad guy['s] hole." They believed Berry was armed. While the door of the trailer remained open, they used loud speakers, and a negotiator tried to communicate with Berry. The negotiator also tried calling Berry on his cell phone. Trying to elicit a response, SWAT members knocked on different sides of the trailer, and some windows were broken in the bedroom, with no response.
After watching the front door of the trailer for about two hours, Deputy Williams finally saw movement immediately in front of him in a small cabinet under the sink in the kitchen. After seeing more movement, Deputy Williams yelled for Berry to come out, that he saw Berry and he wanted to see Berry's hands. According to Deputy Williams, Berry's hands came out and then he emerged from the cabinet. Berry had folded himself into this cabinet, which was about two cubic square feet. He ordered an officer to handcuff Berry, who was arrested. Berry was then turned over to Deputy Cynthia Phelps ("Deputy Phelps").
Deputy Williams testified that a loaded semi-automatic pistol was found in the lower bunk bed in a small bedroom. Also, after opening a closet, the barrel of a shotgun was observed sticking out from behind a pile of clothes.
After Berry was arrested and advised of his rights, he was transported by Deputy Phelps. She asked Berry what his problem was while transporting him to jail, and he responded, "I messed up." It is unclear from the record when police learned Berry was a convicted felon.
Lieutenant Louis Munguia ("Lieutenant Munguia") of the Jefferson Parish Sheriff's Office, an expert in the field of latent fingerprints examination and identification, testified at trial. After comparing the fingerprints *125 in State's Exhibit 1 (an arrest register for Berry regarding marijuana laced with PCP) and State's Exhibit 2 (a bill of information for Berry regarding PCP), Lieutenant Munguia concluded the fingerprints matched. He further testified that these fingerprints matched the fingerprints from State's Exhibit 7, in globo, a "pen pack" from the Department of Corrections.
Thereafter, Lieutenant Munguia examined State's Exhibit 8, a certified copy of a Jefferson Parish probable cause affidavit and arrest report for the present offense and State's Exhibit 9, a fingerprint card that matched the arrest date from State's Exhibit 8. All of the fingerprints in the exhibits examined matched State's Exhibit 10, the fingerprints Lieutenant Munguia took of Berry earlier that afternoon.
Jasmine McGinnis ("Jasmine") testified for the defense. She stated that she was living at 1813 Family Court at the time of the incident. She was in the trailer "doing hair." Two more girls were there with her. She testified that Berry was in the trailer and that she did not notice any guns. According to Jasmine, the officers knocked on the door, and she looked through the peephole. She then told Berry they were there, and Berry hid because he said there were attachments for him. She testified that she and the girls left.
In his first assignment of error, Berry contends his arrest was unlawful because there were no exigent circumstances justifying the intrusion into the residence. He asserts that the officers did nothing to secure consent to enter the residence to arrest him or to search the trailer, or to get a search warrant or an arrest warrant during the three hours they waited. Berry further asserts the guns and his subsequent statement were fruits of the unlawful arrest and should have been suppressed.

ANALYSIS
The Fourth Amendment to the United States Constitution and Article 1, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures. If evidence is derived from an unreasonable search or seizure, the proper remedy is to exclude the evidence from trial. State v. Nicholas, 06-903 (La.App. 5 Cir. 4/24/07), 958 So.2d 682 (citations omitted.) Warrantless searches and seizures are unreasonable per se unless justified by one of the exceptions to the warrant requirement. Id. The State bears the burden of proving the admissibility of evidence that is seized without a warrant. Id. A trial court has great discretion when ruling on a Motion to Suppress, and its ruling will not be disturbed absent an abuse of that discretion. Id. The Fourth Amendment has drawn a firm line at the entrance to the home, and a police officer must have both probable cause to arrest or search and exigent circumstances to justify a non-consensual warrantless intrusion into private premises. State v. Brisban, 00-3437 (La.2/26/02), 809 So.2d 923, 927. Probable cause to arrest exists when the facts and circumstances, either personally known to the arresting officer or of which he has reasonable and trustworthy information, are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Brisban, supra. In determining whether sufficient exigent circumstances exist to justify the warrantless entry and search or seizure, the court must "consider the totality of the circumstances and the `inherent necessities of the situation at the time.'" State v. Warren, 949 So.2d 1215 (citing United States v. Rohrig, 98 F.3d 1506 (6th Cir. 1996)). Exigent circumstances justify a warrantless entry, search, or seizure when "police officers, acting on probable cause *126 and in good faith, reasonably believe from the totality of the circumstances that (a) evidence or contraband will imminently be destroyed or (b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting officers or third persons." State v. Warren, supra (citing United States v. Kunkler, 679 F.2d 187, 191-192 (9th Cir.1982)).
Deputy Phelps was the only witness to testify at the suppression hearing. Deputy Phelps testified that when she arrived, perimeters had already been set around the trailer. She learned that a male had discharged a firearm and had barricaded himself inside of a FEMA trailer. She explained that Berry's girlfriend and the girlfriend's two children exited the trailer and were brought to her unit. Mr. and Mrs. Armstrong and their children were also escorted out of their residence. Thereafter, it was requested that she move them about a block away.
Mr. Armstrong told Deputy Phelps that he wanted to press charges against Berry and no longer wanted him at his residence. The deputy learned that Mr. Armstrong had gone inside the trailer and spoken with Berry, who was holding a handgun. Mr. Armstrong had heard two gunshots and then observed holes in the trailer. Berry told Mr. Armstrong that the firearm accidentally was discharged and caused a hole in the trailer. Mrs. Armstrong called the police, but Berry left, carrying a pillowcase with items in it.
Deputy Phelps testified that the SWAT team eventually knocked the door in, went inside and found Berry hiding in a small cabinet. A pistol was found lying on the bottom bunk bed and a shotgun was found in a closet with some clothes covering it. After Berry was arrested and advised of his rights, he was transported by Deputy Phelps. As she testified at trial, while transporting him to jail, Deputy Phelps asked Berry what his problem was and he responded, "I just messed up."
On appeal, Berry argues that exigent circumstances did not justify the entry into the trailer. He contends that he was not removed from the trailer until over three hours after the police were dispatched the second time and points to Deputy Williams' testimony that the police were prepared to wait once the family was out because time was on their side. Berry also states that the one or two gunshots in the residence occurred hours prior to the second arrival by the police and that the complaining witness no longer believed the weapons were in the trailer. He adds that this was not a hostage situation, and there was no danger that he could escape or destroy evidence because the trailer was surrounded by the police.
Exigent circumstances may arise from the need to prevent the offender's escape, minimize the possibility of a violent confrontation that could cause injury to the officers and the public, and preserve evidence from destruction or concealment. Brisban, 00-3437 at 5, 809 So.2d at 927-28.
On review, we find that the entry was justified by exigent circumstances. Although the officers were prepared to and did wait hours after the other family members exited the trailer, the circumstances were exigent from the moment of their arrival. The officers were trying to avoid a violent confrontation that could have injured them and others at the scene. Deputy Williams testified regarding the danger they faced in walking into a trailer in this situation, since they believed Berry was armed. The officers were simply forming strategies and waiting for an opportunity to detain Berry in the safest manner possible. Viewing the scene through the open door, Deputy Williams reacted to Berry's movement in the kitchen *127 cabinet immediately, hurriedly entering the trailer to detain him. The record also supports the conclusion that the officers feared for Berry's escape, as he was hiding from them, refusing to come out.
We further find that probable cause was also present to justify the intrusion into the trailer. The police had information that Berry was seen earlier in possession of a firearm and had, in fact, discharged a firearm, causing damage to Mr. and Mrs. Armstrong's trailer. Although it is unclear as to whether the children were in the trailer at the time the firearm was discharged, the record shows that they were present in the trailer when Mrs. Armstrong went to the trailer after hearing the gunshot. Further, Mr. Armstrong was outside at the time he heard the gunshot. The trailer was on his property. When the officers responded, Berry created a situation where he barricaded himself in the trailer for hours, refusing to respond to the officers' attempts to contact him. Although the record is unclear as to when the officers discovered Berry was a convicted felon, we find that the officers at least had probable cause to arrest him for illegal use of a weapon. See, LSA-R.S. 14:94.
Because the arrest was lawful, the evidence was legally obtained. The trial court did not abuse its discretion in denying Berry's motion to suppress the evidence and statement. This assignment of error is without merit.
In his second assignment of error, Berry contends the trial judge erred in compelling him to represent himself when he had made no clear motion to do so; when the judge failed to abide by the terms of the representation he had promised in order to obtain a waiver; when Berry unequivocally stated that he did not want to waive counsel; and when Berry's actions demonstrated a lack of capacity to proceed through a trial without an attorney. Berry urges that the misrepresentations made by the trial judge deprived him of due process and his Sixth Amendment right to counsel.
A defendant's right to the assistance of counsel is guaranteed by both our state and federal constitutions. State v. Brooks, 452 So.2d 149, 155 (La.1984). The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution give a defendant the right to counsel as well as the right to defend himself. State v. Bruce, 03-918 (La.App. 5 Cir. 12/30/03), 864 So.2d 854, 857. "A defendant may represent himself only if he makes an unequivocal request to represent himself and knowingly and intelligently waives his right to counsel." Id. (citing Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) and State v. Bridgewater, 00-1529 (La. 1/15/02), 823 So.2d 877, 894, cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003)). Requests that vacillate between self-representation and representation by counsel are equivocal. State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108, 147, cert. denied, ___ U.S. ___, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (quotation omitted).
Before accepting a waiver of counsel, the trial court should advise the defendant of the nature of the charges, the penalty range for the charges, and the dangers and disadvantages of self-representation, such as the failure to recognize objections to inadmissible evidence and the inability to adhere to technical rules governing trials. Bruce, supra. In addition, the court should inquire into the defendant's age, education and mental condition, and should determine according to the totality of circumstances whether the accused understands the significance of the *128 waiver. Id. The competency at issue is a defendant's competence to waive the right to counsel and not his competence to represent himself. Id.
There is no inflexible criteria or magic word formula for determining the validity of a defendant's waiver of the right counsel. Rather, the validity of the waiver must take into account the totality of the circumstances in each case. Bruce, supra. The trial court is given much discretion in determining whether the defendant's waiver was knowing and intelligent. State v. Mendez, 05-173 (La.App. 5 Cir. 1/17/06), 923 So.2d 189, 194.
Berry argues that his waiver of counsel was neither knowing and intelligent, nor clear and unequivocal. He explains that the trial judge promised him that if he waived his right to counsel he would receive "hybrid representation" with Mr. Soignet of the Indigent Defender Board ("IDB") as co-counsel. He contends, however, that the trial judge changed the terms of his representation without reexamining him.
The record indicates that, on the day before trial, defense counsel Mr. Soignet, Berry, and the trial court discussed Mr. Soignet's withdrawal from representation. On the morning of trial, Berry rejected a plea offer made by the State, following which Mr. Soignet requested formal permission to withdraw from the case because of a potential conflict of interest. Initially, the court allowed him to withdraw and ordered IDB to appoint another attorney. Berry objected, denying any conflict of interest. At Berry's request, Mr. Soignet explained for the record that he had previously represented Berry in a trial that resulted in a conviction. Berry told Mr. Soignet that he filed a complaint with the Bar Association. Mr. Soignet believed there was a potential conflict based on ineffective assistance of counsel if Berry were to be convicted of the present charge. Berry denied filing such complaint.
A long colloquy ensued, during which Berry stated several times that he knew the case, that he wanted to represent himself with Mr. Soignet sitting in, and that he did not want another IDB attorney. Mr. Soignet agreed to assist any new attorney appointed by the court.
Dialogue between Berry and the trial court established that Berry could read and write very well and that he understood his right to counsel. The court told Berry he would be held to an attorney's standards. The trial judge explained the charged offense and the sentencing range, along with the dangers and disadvantages of self-representation, including the possible failure to recognize objections. Berry was told that he would basically be held to the standards of an attorney and that Mr. Soignet would only be sitting in. It was clear throughout the colloquy that Berry wanted to represent himself, but wanted Mr. Soignet assisting him. Berry referred to paperwork and filings he had previously made himself on the predicate offense; nevertheless, he stated he realized that the present offense to be tried was "convicted felon by a firearm." The judge found that Berry knew what he was getting into and ordered that he could represent himself, with Mr. Soignet assisting him.
Mr. Soignet urged the court that this would still present the same problem, and again suggested another attorney be appointed with Mr. Soignet as co-counsel. Berry stated he did not want to go to trial with anyone other than Mr. Soignet.
THE COURT: I think that the record's clear Mr. Berry wants to waive you want to represent yourself. You want to waive your right to counsel. However, you want to have Mr. Soignet assist you.

*129 MR. BERRY: I don't want to waive my right to counsel.
THE COURT: Well, you want to represent yourself.
MR. BERRY: I want to represent myself and I want
Mr. Soignet to assist me as my co-attorney.
Berry stated he thought he could do a good job. Because the matter had to be reset, the court decided to appoint another IDB attorney. Mr. Soignet explained to Berry it was fine if he wanted to represent himself, but the judge was now thinking of appointing another public defender. Berry objected to this. Mr. Soignet explained he would still be on the case, but he would not be the lead attorney. Finding Berry's waiver of counsel was knowing and intelligent, the judge granted his motion to represent himself, telling Berry that he would be his own lead attorney with two attorneys assisting him. He ordered Mr. Soignet to remain on the case to assist and that an additional IDB attorney to be appointed.
At trial, the judge explained to Berry that he would be representing himself, that Ms. Katherine Guste ("Ms. Guste") of IDB was appointed to assist him, and Mr. Soignet would be assisting Ms. Guste. During jury selection, Berry again stated that he only had confidence in Mr. Soignet and would rather have only him assisting.
During jury selection, it was apparent that there was a personality conflict between Berry and Ms. Guste. Berry complained that she had no patience, that he had a "conflict of interest" with her, and that they were not getting along. The judge expressed concerns of the jury's seeing them fighting and asked that they try to make it work, noting that, while Berry did not have to take Ms. Guste's advice, he was strongly encouraged to do so.
Berry continued to express further concerns about getting along with Ms. Guste, stating that he wanted to "withdraw" her for ineffective assistance of counsel and wanted Mr. Soignet. Ms. Guste explained that Berry got abrupt with her and "got into her face" when she tried to explain what a stipulation was. When Berry stated he really wanted her off of his case, the judge explained to Berry that he had made several legal errors in some statements of the law and that if he wanted to go forward without her, he would be making a grave mistake. The court asked him, "Do you want to do this without somebody who knows what they're doing?" Berry expressed that he wanted to proceed without Ms. Guste's assistance and strongly objected to Ms. Guste assisting him. The judge ordered that they should not sit too near one another.
Berry asked if Mr. Soignet could sit with him because he was not getting any assistance. The judge recognized that Ms. Guste was and had been assisting him and that Mr. Soignet was in the courtroom to assist Ms. Guste. Thereafter, it appears that, outside the presence of the jury, Berry physically assaulted Ms. Guste. Nevertheless, the record reflects that Berry consulted with Ms. Guste several times throughout the remaining proceedings.
A criminal defendant does not have the right to act both as "represented and representative" due to the potential for disruption of the trial process. State v. Brown, 03-0897 (La.4/12/05), 907 So.2d 1, 22 (quotation omitted). "`Hybrid'" representation does allow a defendant the right to defend himself as co-counsel while standby counsel explains and enforces the basic courtroom rules, as long as standby counsel's participation does not seriously undermine the defendant's appearance as representing himself before the jury. Brown, supra.
*130 A defendant performs the core functions of an attorney's traditional role when he formulates his own trial strategy, determines his own theory of the defense, chooses the witnesses to subpoena and to call to the stand, formulates the questions to be asked of the witnesses, and performs the opening and closing statements. State v. Mathieu, 06-946 (La.App. 5 Cir. 5/29/07), 960 So.2d 296, 303, writ denied, 07-1424 (La.2/1/08), 976 So.2d 714. An attorney functions in an advisory capacity when he is not the controlling strategist, but rather helps the defendant with procedural matters and proper courtroom conduct. Id.
When an attorney partially represents a defendant who assumes functions that are at the core of an attorney's traditional role, the defendant must still knowingly and intelligently waive his constitutional right to have his lawyer perform the core functions, in order to show that the defendant appreciates the possible consequences of mishandling the core functions that lawyers are more competent to perform. Id. As such, when an attorney is appointed as an advisor, the accused must knowingly abandon his right to be represented by counsel. Id.
On review, we find Berry's waiver of counsel was clear and unequivocal as well as knowing and intelligent. He stated several times that he wanted to represent himself with assistance. The only detail that changed from the time of the commencement of the colloquy until the time the judge granted his motion to represent himself was that, instead of Mr. Soignet assisting him at trial, Ms. Guste was appointed to assist him and Mr. Soignet was ordered to assist her. Mr. Soignet was available in court throughout the trial. Although Berry did not want Ms. Guste assisting him, he never withdrew his request to represent himself, and he never indicated that he could not do so. If a defendant is indigent, he has the right to court-appointed counsel; however, an indigent does not have the right to have a particular attorney appointed to represent him. An indigent's right to choose his counsel only extends so far as to allow the accused to retain the attorney of his choice, if he can manage to do so, but that right is not absolute and cannot be manipulated so as to obstruct orderly procedure in courts and cannot be used to thwart the administration of justice. State v. Brown, supra.
Berry next contends that his obsessive behavior, including his flawed perception about the law, his inability to perceive the overwhelming case against him, and his inability to rationally consider the plea offer made, should have prompted the trial judge to conduct a competency inquiry into his ability to waive counsel.
The majority of the factors raised by Berry are facts that became perceptible during trial, not at the time of the waiver. The adequacy of a defendant's self-representation and legal competence are not determinative of a valid waiver of counsel. State v. Moore, 29,212 (La.App. 2 Cir. 1/22/97), 687 So.2d 647. The propriety of allowing a defendant to make this election shall not be judged by what happens in the subsequent course of that representation. Rather, it is the record made in recognizing the waiver that controls. Id.; see also, State v. George, 98-1149 (La.App. 5 Cir. 3/30/99), 743 So.2d 685. The record does not disclose any particular obsession or incompetence on the part of Berry. This assignment of error is without merit.
In his third assignment of error, Berry contends that his fifteen-year sentence was excessive. He argues that his insistence on a trial after the extremely lenient sentence offered pre-trial and his *131 belief that he could represent himself with Mr. Soignet's assistance as co-counsel caused him to be regarded with disfavor by the trial judge. Berry argues the judge was further agitated with his frustration at the substitution of his counsel. Berry urges this provoked the trial judge to impose the maximum sentence as a "knee-jerk reaction." He further argues that the trial judge failed to articulate any factors supporting his sentence and concludes his sentence appears arbitrary and capricious. He contends that his more recent offenses are minor ones.
Berry did not make or file a motion to reconsider sentence. The failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a review of his sentence for constitutional excessiveness only. State v. Stevenson, 05-52 (La.App. 5 Cir. 6/28/05), 908 So.2d 48, 55, writ denied, 05-2592 (La.6/2/06), 929 So.2d 1247.
Berry was convicted of being a felon in possession of a firearm and faced a sentencing range of ten to fifteen years at hard labor without the benefit of parole, probation, or suspension of sentence, and a fine between $1,000 and $5,000. See LSA-R.S. 14:95.1(B). Berry received the maximum fifteen-year prison term.
In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court's sense of justice. The trial judge is afforded wide discretion in determining sentences, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Pearson, 07-332 (La.App. 5 Cir. 12/27/07), 975 So.2d 646. In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. Id. Generally, the maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. Id.
We note the sentencing range for a felon in possession of a firearm has a differential of only five years. Further, the issue is not whether another sentence would have been more appropriate, but rather whether the trial judge abused his discretion in imposing defendant's sentence. Id.
The record shows Berry had prior felony convictions of possession of phencyclidine and possession of marijuana. Further, the testimony demonstrates Berry's conduct during the incident demonstrated a complete disregard for police authority. Additionally, the record shows he had a gun lying next to him in the bedroom at a time when children were in the trailer. As such, Berry created a danger to these children, as well as to the officers. The evidence also showed that Berry discharged the firearm, damaging property. Considering these facts, a fifteen-year sentence is not unconstitutionally excessive.
In his next assignment error, Berry argues that Ms. Guste advised him of his right to appeal, but did not tell him he had to file a motion to reconsider sentence to specifically challenge his sentence on appeal. Berry concludes Ms. Guste's failure to advise him of the technical requirements to challenge his sentence should constitute ineffectiveness.
The Louisiana Supreme Court has held that a claim of ineffective assistance of counsel is most appropriately addressed through Application for Post-Conviction Relief rather than direct appeal, so as to *132 afford the parties an adequate record for review. State v. Nguyen, 06-969 (La.App. 5 Cir. 4/24/07), 958 So.2d 61, 65, writ denied, 07-1161 (La.12/7/07), 969 So.2d 628 (citing State v. Truitt, 500 So.2d 355 (La. 1987)). In brief, Berry has specifically reserved another unrelated argument for post-conviction relief. Thus, judicial economy would not be served by addressing this assignment of error on appeal.

ERROR PATENT REVIEW
The record was reviewed for errors patent, and we find none that require correction.
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.