FRANK J. STICH, Judge ad hoc.
Plaintiff, Mrs. Geraldine Phelan, wife of Frank Charles Barbara, as sole heir and daughter of her deceased father,' Richard Phelan, instituted this suit against defendant, New Orleans Public Service, Inc., for $15,000.00 damages resulting from the death of her said father, Richard Phelan, who was killed on December 13th; 1945, at about 6 a. m. when he wias run over by the wheels on the rear truck of a street car at Jackson Avenue and Tchoupitoulas Street in the City, of New Orleans.
Defendant filed exceptions of vagueness and of no right or cause of action, which were overruled by the trial judge, and thereafter filed its answer.
After a trial in the lower court judgment was rendered in favor of defendant dismissing plaintiff’s suit.
The trial judge assigned written reasons for judgment wherein he analyzed the -issues and the evidence so thoroughly and completely that, after a careful review of the record, we adopt them as our own:
“This is a suit to recover $15,000.00 damages for the loss of love, 'affection and earnings resulting from the death of the father of plaintiff, Who was instantly killed when run over by an electric street car of defendant on the morning of December 13th, 1945, about 6:00 A.M. The scene of the accident was the terminus of the Jack-son Avenue line at Tchoupitoulas Street.
“The negligence charged against defendant is that its agents had an opportunity to avoid the accident and failed to do so. Defendant admits that deceased was run over and killed by one of its street cars, but denies any negligence on its part; and, in the alternative, pleads that the accident was due to the contributory negligence of the deceased in concealing and hiding himself-in the darkness on the uptown rail of the uptown tracks on Jackson Avenue, in a position and under circumstances that he could not reasonably be expected to be seen; and in placing himself in a position of danger, where he knew or should have *174 known, lie could not be discovered and knew, or should have known, that a street car, when moving from its terminus, was bound to kill or injure him without his presence being discovered.
“At the time of the accident defendant operated its double street car tracks on Jackson Avenue on the neutral ground, elevated above and separating the paralleling roadways.
“The double tracks continued to within 120 feet from the terminal at Tchoupit-oulas Street, when the downtown track crossed over to the uptown track, and the single tracks continued the distance of 120 feet to Tchoupitoulas Street. The cars would stop somewhere on the 120-foot single track before starting the return outbound trip.
“When the cars reached the terminus at Tchoupitoulas Street, the doors facing the uptown roadway of Jackson Avenue would be closed, because the car steps were two feet above the street, and boarding or alighting on that side would be dangerous. Passengers were required to board and alight from the neutral ground.
“Plaintiff produced no witnesses but sought to develop her case by cross-examination of defendant’s car crew and other witnesses. Nobody witnessed the accident itself.
“According to the motorman and conductor, both of whom had been with defendant for more than 30 years, with excel-lant safety records, they remained at the terminus about five minutes before starting the outbound trip. The motorman and conductor testified that as the car started on the outbound trip, and had gone IS or 20 feet, the car was jolted twice in rapid succession from under the rear truck. Believing that the jolts were due to t'he derailment of the car or the loss of a motor, the motorman proceeded to a normal stop within' 20 feet on the single track, just short of the switch or cross-over. Upon investigation he found the body of a man across the uptown rail about 15 feet in back of the car, his body having been severed in two about the waist, with his legs dangling from the neutral ground into the street.
“Plaintiff by mathematical calculation seeks to establish that both front and rear trucks passed over the body and that the two successive jolts were when the front wheels severed the body, no jolts being felt from the rear truck wheels because the body already had been severed. All this to establish that deceased crossed or ran in front of the moving car and the motorman should have seen him and avoided the ■accident under the doctrine of ‘Discovered Peril’.
“The car is mounted on two trucks of 4 wheels each, located near either end of the car. The 4 wheels on either end are about 3 feet apart, explaining why the two jolts were in rapid succession. Since the body was found on the track in the rear of the car, and only two jolts were felt, it is evident that only the rear truck passed over the body. Had both trucks passed over the body, front and rear, there would have been 4 jolts.
“Further, had the deceased been struck in front of the car his body would have hit the ‘tripper’ and released the front fender or ‘cpw catcher’ and been thrown off the track.
“When considering the single terminus track is 120 feet long, the car 47 feet long; that it originally stopped about 12 feet from the end of the rails and -after starting the outbound trip came to a stop just short of the switch or cross-over; that the body was dragged about 8 feet before the wheels, passed over it, and was found 15 feet behind the car, plus the fact that the front '■cow catcher’ or fender would have been released had it contacted an object, it is logical to conclude that only the rear truck wheels passed over the body. However, defendant’s liability is not dependent upon whether the front, the rear, or both trucks passed over the body, but only by the test, as explained below, if it was the duty of the car crew to have seen deceased when he approached and stumbled or plunged under the car. Deceased was not lying on the track in front of the parked car, because the motorman said he would have seen him.
“The deceased was well known to the car crew. It was not unusual for him to- *175 take that particular car while going to his work as a street cleaner for the City of New Orleans. Whether he was late or running for the car and stumbled or fell under the wheels, or whether he deliberately placed himself in a position of danger, is not known. From experience, he knew the street side was not the point at which passengers entered or alighted from the car at the terminus because the car steps were two feet from the street.
“There was testimony suggesting the possibility of suicide. Mr. April, a conductor for defendant and brother-in-law of deceased, who identified the body, arrived on the scene of the accident on his regular run on the Jackson Avenue line, shortly after the car in question reached the terminus. He testified that deceased shortly before and during a fit of despondency, told him that he, deceased, ‘was doomed to die under his car’, meaning Mr. April’s car. This creates the suspicion that deceased possibly plunged under the car in the belief that it was Mr. April’s car, as Mr. April’s ‘run’ was either before or after the car involved in the accident, in fulfillment of his threat or prophecy.
“The motorman (Helwick), with 31 years of experience, and with a perfect safety record for 19 or 20 consecutive years, said he knew and would have recognized deceased had he seen him approaching the car. He saw no one and 'had no reason to suspect anyone was approaching the car from the side or rear; that he could see a reasonably safe distance ahead and that if deceased had approached or crossed the track in front of his car, vhe would have ■seen him.
“A Mrs. Hurley, a passenger in the car, was on her way to work at Lane Mills on Tchoupitoulas and Cadiz Streets, two miles away, where she was due at 7:00 A.M. She had taken this particular street car on many occasions. She substantially corroborated the statements of the car crew about the jolting of the car just after it started from the terminus on its outbound trip.
“The inside lights and the front headlight were burning. They were visible to the deceased or anyone else who might have approached the car. The body was found on the rail nearest the street, indicating clearly that deceased approached the car from the street side and not the neutral ground side. The crew could not be expected to look for or see anyone attempting to board the car from the wrong side.
“Plaintiff seeks to invoke the doctrine of ‘Discovered Peril’. In the case of Heydorn v. New Orleans Public Service, Inc., [La.App.] 35 So.2d 893, Judge Janvier, in fully discussing this doctrine, explained that it grows out of and is an extension of, the doctrine of ‘Last Clear ■Chance’. This doctrine protects one who has negligently placed himself in a precarious situation but is no longer able to protect himself; and permits recovery from one who caused 'him injury, if the latter did or should have discovered the peril and avoided the accident.
“In the cited case, it was held that the motorman was not negligent in failing to see an intoxicated pedestrian lying in the shadows of bushes, with no part of ihis body extending across the rail, 120 feet from the street intersection at which the motorman was required to stop.
 “Since the street car in the present case had been fully stopped for more than five minutes at its terminus, and the ■deceased had placed himself on the rails on the side of the car where passengers were not to enter, the car crew could not be expected to anticipate his presence there, nor to have discovered his peril. Under the circumstances of this case, the accident, while tragic, was unavoidable insofar as defendant is concerned. Since deceased was a pedestrian, defendant owed to him only the duty of ordinary care to discover whether or not he had placed himself in a position of peril but the duty of discovery is not absolute.
“I can find no breach of duty on the part of defendant, and there will be judgment accordingly.’’
For the foregoing reasons the judgment appealed from is affirmed.
Affirmed.
McBRIDE, J., recused.