JUDE G. GRAVOIS, Judge.
| ^Defendant, Everett J. Hughes, appeals his convictions and sentences for second degree murder and attempted second degree murder. On appeal, he argues that the evidence adduced at trial was insufficient to sustain the returned guilty verdicts because the evidence supported a finding that defendant acted in self-defense and thus his actions were justifiable. Further, defendant argues that his sentences are excessive. After thorough review and consideration of the record and applicable law, for the reasons that follow, we affirm defendant’s convictions and sentences, but remand the matter for correction of the commitment, as noted herein.

PROCEDURAL HISTORY

On May 3, 2012, a Jefferson Parish Grand Jury indicted defendant, Everett J. Hughes, with the second degree murder of A1 “Darnell” Williams, in violation of La. R.S. 14:30.1 (count one), and attempted second degree murder of Shane D. Petty, in violation of La. R.S. 14:27 and 14:30.1 (count two). Defendant was arraigned on May 7, 2012 and pled not guilty. On June 22, 2012, defendant filed | ¡¡omnibus and pre-trial motions, including motions to suppress statement(s), evidence, and identification. A motion hearing was held on September 28, 2012 regarding defendant’s motions to suppress evidence and identification, and the trial court denied defendant’s motion to suppress evidence. Additional hearings were held on defendant’s motion to suppress identification on November 26-27, 2012 and February 22, *983 2013. The trial court denied defendant’s motion to suppress identification on February 22, 2013.
On September 24, 2013, defendant went to trial before a 12-person jury, which on September 26, 2013 found him guilty as charged as to both counts. On November 14, 2013, defendant filed a motion for a new trial and for post-verdict judgment of acquittal, which the trial court denied on November 15, 2013. After waiving sentencing delays, defendant was immediately sentenced to life imprisonment on count one, and fifty years imprisonment on count two. Both sentences were ordered to run concurrently and to be served at hard labor without the benefit of parole, probation, or suspension of sentence. This timely appeal followed.

FACTS

Shane Petty, a victim of the shooting incident and the nephew of the murder victim (Mr. Williams), testified that he was present on January 2, 2012 when defendant shot and killed Mr. Williams. He also identified defendant in court.
Mr. Petty testified that he and Mr. Williams ran errands for the family that day, visiting several stores together on the date of the incident. He stated that they also visited the residence of Mr. Williams’ fiancé, Rachel Durall, where defendant was present. While at Ms. Durall’s residence, Mr. Williams and defendant had a “basic conversation” about Ms. Durall. According to Mr. Petty, he had no reason to believe that the conversation would lead to later violence between the two and | Relieved the problem was solved. Mr. Petty stated that after he and Mr. Williams finished visiting the stores, they visited the home of Mr. Petty’s grandmother, Barbara Williams, who was also Mr. Williams’ mother. As Mr. Petty left Ms. Williams’ house, Ms. Williams stopped him and told him to let Mr. Williams (the victim) bring him home because Mr. Petty did not have car insurance. Mr. Petty stated that as a result, he and Mr. Williams left the house together in a vehicle belonging to Mr. Petty’s mother, with Mr. Petty driving.
Mr. Petty stated that after leaving the house, they turned on Spruce Street, where defendant was standing on the corner. He testified that defendant “flagged” them down, and Mr. Williams told Mr. Petty to stop the vehicle. Mr. Petty stated that an altercation began, with defendant stating that he did not like what had occurred in their first conversation. Mr. Petty stated that Mr. Williams responded that he thought the first conversation was finished. The argument became louder, angrier, and more heated. Mr. Petty stated that Mr. Williams was angry, and both Mr. Williams and defendant elevated their voices. He stated that Mr. Williams attempted to exit the vehicle, and at that point defendant backed up, opened fire, and shot him. Mr. Petty stated that after defendant began shooting, he had to “run for his life” around the corner of the houses. Mr. Petty stated that when he looked back, he saw that defendant was shooting while running in the opposite direction.
Mr. Petty testified that he and Mr. Williams did not have a gun during the incident. He stated that only one gun was involved, and that defendant was the only person who fired a gun. He stated that after the shooting, he ran directly to his grandmother’s house and informed her of the shooting. As he and his grandmother walked back to the crime scene, he realized that he had been injured. Mr. Petty stated that he did not enter the vehicle at that point. He explained that he was afraid to return to the vehicle because he believed his uncle had been killed, | sand he did not want to see him in that condition. He further testified that he did not remove anything from the vehicle and did not see *984 anyone, other than an officer or an emergency responder, remove anything from the vehicle. Mr. Petty said that he did not see the person who opened the car doors remove anything from the vehicle. He also testified that there were more than four people around the vehicle.
Mr. Petty stated that he provided • a statement to officers and identified defendant as the shooter in a photographic lineup. Officers took photographs of his injuries sustained during the shooting incident, and he testified that the photographs accurately depicted his injuries. He testified that he never had any dispute with defendant and that defendant had no reason to shoot him on the date of the incident. According to Mr. Petty, he did not attack defendant, and instead, he exited the vehicle and fled in a different direction.
On cross-examination, Mr. Petty acknowledged that although the conversation became heated, he and Mr. Williams chose to stay during the altercation when they could have driven away. He also stated that Mr. Williams told defendant that if he had something against him, then he would have previously “smacked” him when they first met. Mr. Petty further stated that Mr. Williams was “furious” because he believed defendant was behaving disrespectfully to him during the conversation.
Barbara Williams, the mother of the murder victim, testified on behalf of the State that prior to the shooting, her son (Mr. Williams) left her house with her grandson, Mr. Petty. She explained that Mr. Williams was accompanying Mr. Petty to the house of her daughter, who was also Mr. Petty’s mother. Ms. Williams stated that it was common for her family to drive down Avenue I to Spruce Street to exit the neighborhood and reach her daughter’s house.
| f;Ms. Williams stated that within minutes after Mr. Williams and Mr. Petty left her house, Mr. Petty returned and informed her that her son was the victim of a shooting. According to Ms. Williams, neither she nor Mr. Petty called 9-1-1 on the date of the incident. She further stated that she walked up to the vehicle and saw her son lying inside. She explained that Mr. Williams’ eyes were open at first, and when his eyes closed, she called her daughter. She also testified that she did not see Mr. Williams or Mr. Petty with a gun, she did not keep a gun in her house, and she did not know Mr. Williams to possess a gun. Ms. Williams further testified that no one brought a gun to her house aftér the shooting.
M.H., who was eleven years old at the time of trial, testified that on the date of the incident, she and her younger brother were in her mother’s vehicle, which was parked outside of their residence on Spruce Street. M.H. testified that a man and two boys were talking while standing on the sidewalk. She stated that a gold SUV pulled up and stopped. M.H. stated that the passenger of the SUV and the man on the sidewalk began arguing. She testified that as the arguing became louder, the man standing outside the ■ SUV pulled a gun from his jacket pocket and shot the other man. According to M.H., she did not see anyone else with a gun. She also stated that she was unable to see inside the SUV.
M.H. said that after the shooting began, she grabbed her younger brother, ducked between the car seats, and continued to peek. She also stated that the two boys on the sidewalk began running, and the driver of the SUV jumped out and also began running. M.H. testified that after the shooter shot the man, he ran to a corner,[1] shot “on the ground,” and ran *985 towards the back street of the neighborhood. M.H. testified that the driver of the SUV did not have anything in his hands when he exited the vehicle because he was pulling his pants up.
17M.H. stated that after the shooter left the scene, her mother told her to grab her brother, and they ran inside their house and locked the doors. M.H. stated that she later provided a statement to police officers. She explained that she was unable to identify anyone from a photographic lineup because she only saw the side of the shooter’s face. M.H. described the perpetrator as wearing a black coat, having dreadlocks that reached down to the middle of his back, and having gold teeth.
On cross-examination, M.H. testified that she saw the vehicle that was occupied by the victims circle the street twice. She also acknowledged that in her statement to the police, she stated that she did not see “the guy run from the car.” On redirect, M.H. explained that she was nervous, shaking, and crying when she spoke to the police, but that she really did see someone exit the vehicle. She also stated that she only saw one gun during the incident.
Chiva Lagarde, who testified for the State, stated that at the time of the shooting, she was inside of her residence on Spruce Street near the corner of Avenue I. She stated that prior to the shooting, she brought the garbage outside and saw defendant, Rashad Walker, and David Alexander walking towards Spruce Street. She explained that she knew defendant, Mr. Williams, Mr. Petty, Mr. Walker, and Mr. Alexander from the neighborhood.
Ms. Lagarde stated that she returned inside and was in her kitchen cooking when she heard gunshots. After the shooting, she looked out of her screen door and saw two people running. Defendant was running farther away from her residence, and the other unknown person ran through the field across from her residence. She stated that she was unable to determine whether either person held a gun because she was not wearing her eyeglasses at that time. Ms. Lagarde stated that after the shooting, she called 9-1-1, went outside, and saw people walking towards the vehicle.
|sMs. Lagarde walked towards the vehicle and saw someone sunken in between the two front seats. She testified that another female, possibly named Shandell, opened the driver side door and screamed. Ms. Lagarde stated that she opened the passenger side door because she was unable to see anything through the driver’s side. She stated that Mr. Williams looked at her and made guttural noises as if he was trying to speak to her. She testified that she did not see a gun in the vehicle, but she was focused on Mr. Williams and not on the interior of the vehicle. Ms. Lagarde also testified that she did not remove a gun from the vehicle and did not see anyone else remove a gun from the vehicle. She stated that she saw Mr. Petty outside after the shooting, but she was unsure whether or not he approached the vehicle.
Sergeant Michael Nocito, a road supervisor of the Westwego Police Department, testified on behalf of the State that on January 2, 2012, he was the first officer to respond to a shooting that occurred in the 1000 block of Spruce Street in Westwego. Sergeant Nocito stated that he observed a black male in the passenger seat of a SUV. He described the victim as being slumped over the console towards the back of the vehicle and that the top portion of his shirt was “full of blood.” Sergeant Nocito explained that after he secured the crime scene, he located the driver of the vehicle.
Keith Dykes, a former uniformed patrolman of the Westwego Police Department, testified on behalf of the State that on the date of the incident, he patrolled the *986 neighborhood where the shooting occurred. He stated that he stopped three individuals who fit the general description of the subjects. Mr. Dykes stated that he conducted a field interview of two of the subjects, and another officer conducted a field interview on the third subject. According to Mr. Dykes, the subjects identified themselves as “Jared” Walker and David Alexander during the | interview. On cross-examination, Mr. Dykes stated that his attempt to verify the information by conducting a search for both names yielded no results. On redirect, Mr. Dykes testified that another officer was able to determine that Mr. Walker had provided a false name.
Detective Corey Boudreaux of the West-wego Police Department testified on behalf of the State that on the date of the incident, he was working dually as a patrolman and a crime scene technician. He testified that he did not locate any firearms in the vehicle or anywhere on the scene. He stated that the evidence collected at the scene included spent casings and bullet fragments. On cross-examination, Detective Boudreaux acknowledged that although he did not see anyone access the vehicle, anyone was able to access the vehicle.
Thomas Bryson, a former officer of the Westwego Police Department, testified on behalf of the State that on the date of the incident, he participated in the investigation that led to the arrest of defendant for the shooting death of Mr. Williams. Mr. Bryson testified that he did not develop any information or any physical evidence that would indicate that there was more than one gun at the time of the shooting. Mr. Bryson stated that one or more 9-1-1 callers provided information that there was one suspect. He explained that one 9-1-1 caller stated that three black males left the area, which prompted the officers to look for those subjects to be traveling together.
Mr. Bryson also testified that he interviewed Mr. Petty on the date of the incident. He stated that Mr. Petty appeared nervous. He became aware that Mr. Petty had suffered injuries and that he received medical treatment after the interview. According to Mr. Bryson, after defendant had been developed as a possible suspect, he presented Mr. Petty with a six-panel color photographic |inlineup. Mr. Bryson stated that Mr. Petty identified defendant as the person he saw commit the shooting.
Mr. Bryson explained that although he made efforts to discover the firearm used in the incident, including executing a search of defendant’s residence twice, he was unable to locate the firearm.
Mr. Bryson testified that Rashad Walker was the only person to make a statement that suggested there was more than one gun. However, although Officer Dykes conducted a field interview of Mr. Walker on the date of the incident, Mr. Walker provided an inaccurate name and also did not mention at that interview that he- had witnessed the shooting. According to Mr. Bryson, Mr. Walker provided three taped statements to the police, including a statement on January 4 and two statements on January 11. Nine days after the date of the incident, in his second taped statement on January 11, 2012, Mr. Walker indicated for the first time that the victim, Mr. Williams, had a gun at the time of the shooting. According to Mr. Bryson, Mr. Walker did not provide this information in his first two taped statements.
In addition, Mr. Bryson stated that relevant information was recorded by two neighborhood crime cameras in close proximity to the incident, located on Avenue I and Spruce Street, and at Avenue I and Sixth Street. He testified that although it “panned away” immediately before the shooting, one of the crime camera’s recordings depicted the victim’s SUV and the *987 three individuals standing near the vehicle. Mr. Bryson further stated that the crime camera’s recording depicted an individual, later identified as Mr. Petty, lift up his shirt and' examine his body. The crime camera also showed a woman, later identified as 9-1-1 caller Ms. Lagarde, running towards the vehicle. He further testified that between the time that the shooting would have occurred and the time the recording ended approximately Inforty minutes later, he did not observe anyone that was non-law enforcement remove a gun or any other object from the vehicle.[2] Mr. Bryson further explained that the second crime camera showed a “moving shape” in an open area behind M.H.’s house traveling in the direction of Mr. Petty’s grandmother’s house, which was consistent with the path that Mr. Petty described taking after the shooting incident.
On cross-examination, Mr. Bryson testified that the recording from the crime camera did not reflect that Ms. Lagarde entered the vehicle. Mr. Bryson testified that Ms. Lagarde opened the doors of the vehicle to check on the victim’s well-being because she knew the victim. Mr. Bryson also stated that Mr. Petty returned to the crime scene along with his grandmother, Ms. Williams, but the recording reflected that Mr. Petty remained away from the vehicle. Mr. Bryson acknowledged that the crime camera panned away from the vehicle approximately every eight to fifteen seconds, and therefore, the vehicle was not in view the entire time. Mr. Bryson farther acknowledged that he was unable to unequivocally determine that Mr. Petty was the individual running in the recording. Mr. Bryson further stated that the only bullets found at the crime scene were bullet fragments, which were too damaged to be tested by ballistics experts. On redirect, Mr. Bryson explained that his search for ballistic material extended all the way to the end of the block.
Dr. Dana Troxclair of the Jefferson Parish Coroner’s Office was qualified as an expert in forensic pathology. Dr. Trox-clair testified on behalf* of the State that she performed an autopsy on the victim.[3] Dr. Troxclair testified that Mr. Williams’ cause of death was a single gunshot wound to the front of the neck. She explained hathat the gunshot wound indicated that the gun was fired from two to three feet away. According to Dr. Troxclair, the blood in the victim’s lungs and stomach indicated that he was alive for at least a few seconds to a couple of minutes after being shot. She also stated that a projectile was recovered from the victim’s body.
Jene Rauch, a forensic scientist of the Jefferson Parish Sheriffs Office crime lab, was qualified as an expert in firearms, tool mark examination, and shooting reconstruction based on a stipulation by both parties. Ms. Rauch testified that she conducted firearms analysis in the investigation of the shooting death of Mr. Williams. She explained that she examined ten 9 mm fired cartridge casings, a projectile from the autopsy, and jacket fragments and lead-like projectiles recovered from the vehicle. She testified that after she examined the firearms evidence for purposes of firearms identification, she determined that all ten 9 mm casings were fired from the same weapon. She was also able to determine that the projectiles and jacket fragments were all fired from the same class and type of barrel, but was unable to determine that they were fired from the same weapon. She stated that she was *988 able to determine that the bullet recovered from the autopsy was a .38 caliber class, which was consistent with 9 mm casings. Ms. Rauch testified that there was no evidence presented to her that would suggest that more than one weapon was fired. She further stated that the weapon used to murder Mr. Williams was never presented to her for examination.
Ms. Rauch testified that the vehicle had four bullet entrances, which showed that the bullets came from outside the vehicle and traveled into the vehicle. She also explained that she could only conduct a trajectory analysis on one entrance hole for various reasons. She determined that one of the bullets traveled from the 11svehicle’s front passenger’s side towards the driver’s side at a slightly downward angle.[4]
Ms. Rauch explained that there were two distinct groups of casings which included four casings in the first group and six casings in the second group. Regarding the first group of casings, she was able to determine based on the cartridge case placement, trajectories, and bullet holes in the vehicle that the vehicle was likely stationary and the shooter was stationary at or near the passenger’s side of the vehicle. She also stated that the fire was concentrated on the front part of the vehicle. Regarding the second group of casings, Ms. Rauch explained that the linear pattern was consistent with a mobile shooter who was firing at the victim while he was moving. She further testified that the casings found would be consistent with the suspect firing at Mr. Petty as he fled while the suspect fled in the other direction. She further testified that she believed that all of the shots were fired continuously within eight seconds.
The defense presented testimony contrary to the version of events offered by the State’s witnesses. Rachel Durall testified on behalf of the defense that between 2:00 p.m. and 4:00 p.m. on the date of the incident, defendant was at her residence for about ten minutes. She explained that defendant was sitting and smoking near the threshold of her door. According to Ms. Durall, Mr. Williams, her fiance, entered her residence and asked defendant to leave in order to have a private conversation with Ms. Durall. Ms. Durall stated that Mr. Williams gently grabbed her around her shoulders and stated he loved her and wanted to marry her. Ms. Durall then asked Mr. Williams to leave her residence. At first, she stated that Mr. Williams left immediately. However, after being refreshed by her previous | ustatement to officers, she remembered asking Mr. Williams to leave again.[5] Ms. Durall also stated that her mother had to assist her in removing both defendant and Mr. Williams from her residence.
Rhonda Nicole Carter, the mother of defendant’s son, testified on behalf of the defense that between December 10th and 20th of 2011, Mr. Williams threatened to kill defendant as she, defendant, and their two-year-old son, Everett, Jr., were walking down Fourth Street in Westwego. Mr. Williams approached them in an SUV and told defendant that “it was down.” She explained that she did not know Mr. Williams by name at that time. The conversation between Mr. Williams and defendant became louder and an argument ensued. She stated that she told Mr. *989 Williams and defendant to stop arguing in front of her son. Ms. Carter explained that she overheard Mr. Williams state, “I’ll kill you right now. I’ll kill you and your family.” Ms. Carter stated that she stood in front of defendant and asked Mr. Williams to move on. According to Ms. Carter, Mr. Williams stated, “Ni* * *r, this ain’t over” as he pulled off. Ms. Carter explained that she did not call the police because she did not want to be labeled a “snitch,” and she was seared for her life.
Ms. Carter also stated that she saw a gun on Mr. Williams’ lap. On cross-examination, Ms. Carter testified that Mr. Williams had a semi-automatic weapon. She recognized the type of gun because it was the same type she carried while being employed at a security company. Ms. Carter stated that Mr. Williams was the man that threatened her and her family based on information from the Westwego Police Department. She later stated that she recognized Mr. Williams after seeing his picture in the newspaper. Ms. Carter testified that defendant did |15not have a gun at the time of Mr. Williams’ threats and did not own a gun on the date of the incident.

ASSIGNMENT OF ERROR NO. ONE

Sufficiency of the evidence, justification

In his first assignment of error, defendant argues that the evidence was insufficient to prove guilt beyond a reasonable doubt. Defendant asserts that he presented evidence that the shooting was justified, and the State failed to negate that he acted in self-defense. Defendant argues that Mr. Williams threatened him after learning that he was close friends with Mr. Williams’ former flaneé Ms. Durall. Defendant further asserted that one month prior to the shooting, Mr. Williams was in possession of a firearm when he threatened the lives of defendant, defendant’s child, and the mother of defendant’s child. Defendant argues'that after he and Mr. Williams had a verbal altercation three hours before the shooting, Mr. Williams and Mr. Petty drove around the neighborhood until finding and confronting defendant.
Defendant asserts that bystanders reported to police that Mr. Williams was in possession of a firearm. Defendant contends that the State offered no proof that Mr. Williams was not in possession of a firearm. Defendant asserts that eyewitnesses observed defendant “ducking as shots were fired.” Defendant argues that it would not be unreasonable for a rational trier of fact to believe that Mr. Williams was in possession of a firearm and that Mr. Petty removed the firearm from the scene. Defendant complains that the trial court did not allow the jury to hear evidence regarding Mr. Williams’ physical violence against Ms. Durall. Further, defendant argues that the casings found at the scene did not exclude the possibility of a second weapon.
|1fiThe State responds that the testimony established that defendant had the specific intent to kill the victims when he opened fire upon them. The State argues that the testimony and evidence supported that there was only one gun used during the shooting, and the witnesses’ testimony did not reflect that the murder victim was in possession of a firearm during the incident. The State argues that no weapon was discovered in the vehicle, and M.H. testified that Mr. Petty did not exit the vehicle with a firearm. The State further argues that based on the testimony of the witnesses, defendant’s contention that his actions were justifiable has no merit. The State concludes that defendant’s claim should be denied because the evidence was sufficient to establish that defendant killed Mr. Williams and had specific intent to kill both Mr. Williams and Mr. Petty.
*990 In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or, as in this case, a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
Defendant was convicted of second degree murder of Mr. Williams in violation of La. R.S. 14:30.1. Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). The determination of specific intent is a question of fact. State v. Durand, 07-4 (La.App.17 5 Cir. 6/26/07), 963 So.2d 1028, 1034, writ denied, 07-1545 (La.1/25/08), 973 So.2d 753.
Applying the legal principles to the evidence in this case, we find that a rational trier of fact could have found under the Jackson standard that the State carried its burden of proving that defendant acted with specific intent to kill or inflict great bodily harm. In the present case, Mr. Petty testified that defendant opened fire and shot Mr. Williams. M.H. testified that the man standing outside of the vehicle pulled out a gun and shot the other man inside of the vehicle. Dr. Trox-clair of the coroner’s office testified that Mr. Williams died from a gunshot wound to the neck. Ms. Rauch, a firearm expert, testified that the bullets entered the vehicle from the outside of the vehicle, and the shooter was near the passenger side of the vehicle. Specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person. State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 585, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000); State v. Batiste, 06-869 (La.App. 5 Cir. 4/11/07), 958 So.2d 24, 27.
Defendant was also convicted of the attempted second degree murder of Mr. Petty in violation of La. R.S. 14:27 and 14:30.1. The crime of attempted second degree murder requires proof, beyond a reasonable doubt, of the specific intent to kill a human being and the commission of an overt act in furtherance of that goal. This Court has re&ognized that although specific intent to inflict great bodily harm is sufficient to support a second degree murder conviction, attempted second degree murder requires a specific intent to kill. State v. Bannister, 11-602 (La.App. 5 Cir. 2/14/12), 88 So.3d 628, 634, writ denied, 12-628 (La.6/15/12), 90 So.3d 1060.
In the instant case, evidence shows that defendant had the specific intent to kill Mr. Petty and that he committed an overt act in furtherance of that goal. Mr. | isPetty testified that he ran for his life, and when he looked back, he saw defendant shooting. Mr. Petty sustained three gunshot wounds. Ms. Rauch, a firearms expert, testified that the evidence was consistent with a mobile shooter firing at a moving victim, which was also consistent with the suspect firing at Mr. Petty.
Defendant argues that the evidence supported a finding that defendant acted in self-defense and that his actions were justifiable. Defendant further argues that the State failed to negate that he acted in self-defense. When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove *991 beyond a reasonable doubt that the defendant did not act in self-defense. State v. Reed, 11-507 (La.App. 5 Cir. 2/14/12), 88 So.3d 601, 607, writ denied, 12-644 (La.9/14/12), 97 So.3d 1014. However, in non-homicide cases, this Court has found that the defendant has the burden of proof by a preponderance of the evidence that his actions were in self-defense.[6] See State v. Nailor, 10-1062 (La.App. 5 Cir. 11/15/11), 78 So.3d 816, 821, writ denied, 11-2780 (La.4/27/12), 86 So.3d 626; see also State v. Sparkman, 13-640 (La.App. 5 Cir. 2/12/14), 136 So.3d 98, 106.
The fact that an offender’s conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18. According to La. R.S. 14:20(A)(1), a homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.”
|1flA person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know his desire is to withdraw and discontinue the conflict. La. R.S. 14:21. In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. King, 11-767 (La.App. 5 Cir. 2/28/12), 88 So.3d 1147, 1153, writ denied, 12-660 (La.9/14/12), 99 So.3d 35.
The determination of a defendant’s culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. The jury is the ultimate fact-finder in determining whether the State negated self-defense beyond a reasonable doubt. State v. Sinceno, 12-118 (La.App. 5 Cir. 7/31/12), 99 So.3d 712, 720, writ denied, 12-2024 (La.1/25/13), 105 So.3d 713.
In the instant case, the defense attempted to establish that defendant shot the victims in self-defense because Mr. Williams was allegedly in possession of a firearm and had threatened him earlier. However, the State presented evidence to negate defendant’s claim of self-defense beyond a reasonable doubt regarding the shooting of Mr. Williams. Further, defendant failed to establish by a preponderance of the evidence that he acted in self-defense in shooting Mr. Petty. In the present case, Mr. Petty testified that he and Mr. Williams were not in possession of a firearm during the incident. M.H. testified that she did not see anyone else with a gun. She also testified that the driver of the SUV did not have anything in his hands when he exited the vehicle because he was pulling his pants up. Ms. Lagarde, who checked on the well-being of Mr. Williams before the |2nambulance arrived, testified that she did not notice a gun in the vehicle and did not remove a gun, or *992 see anyone else remove a gun from the vehicle.
Further, Detective Boudreaux testified that he did not locate any. firearms in the vehicle or anywhere on the crime scene. Mr. Bryson testified that he was present at the crime scene and did not develop any information or physical evidence that would indicate that there was more than one firearm present at the time of the shpoting. He also explained that his search for ballistic material extended all the way to the end of the block. Mr. Bryson further testified that the crime camera footage reflected that after Mr. Petty returned to the crime scene with Ms. Williams, Mr. Petty and Ms. Williams remained away from the vehicle. Also, Ms. Williams testified that she did not see Mr. Williams or Mr. Petty with a firearm, she did not keep a firearm in her house, and no one brought a firearm to her house after the shooting.
Further, Mr. Bryson testified that Mr. Walker stated in a taped statement to police that Mr. Williams had a gun at the time of the shooting. However, Mr. Bry-son explained that Mr. Walker had previously provided a false name to police on the date of the incident, and he waited until nine days after the incident during his third taped statement to mention for the first time that Mr. Williams had a firearm. Defendant also argues that Mr. Williams and Mr. Petty drove around the neighborhood until finding defendant. M.H. testified that she saw the vehicle twice prior to the incident. However, Mr. Petty testified that he and Mr. Williams had visited several stores that day, and Ms. Williams testified that Spruce Street was her family’s normal route in and out of the neighborhood. Also, the defense \n argues that Ms. Lagarde demonstrated for the jury that defendant was “ducking” as he ran.[7]
The defense presented the testimony of Ms. Durall, who testified that on the afternoon of the date of the incident, Mr. Williams, who was her fiance, asked defendant to leave her residence, and her mother had to assist her in removing both Mr. Williams and defendant from her residence. Ms. Carter, the mother of defendant’s son,, testified that-a few weeks prior to the incident, she saw Mr..Williams in possession of a firearm when he threatened her, defendant, and their young son.
Defendant also argues that the casings found at the scene did not exclude the possibility of a second weapon. However, the record reflects that Ms. Rauch, a firearms expert, testified that all ten 9 mm cásings recovered from the crime scene were fired by the same weapon and that no evidence was presented that more than one weapon was fired. It is noted that Ms. Rauch also testified that she was able to determine that the projectiles and jacket fragments were all fired from the same class and type of barrel, but' was unable to determine that they were fired from the same weapon.
The jury heard this conflicting testimony and credited the version of events established by the State’s witnesses. Also, the trial court instructed the jury regarding self-defense.[8] The jury is the ultimate fact-finder in determining whether the State negated self-defense beyond a reasonable doubt. Sinceno, supra. *993 Moreover, the credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; | ?,;>the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. Therefore, we find that the State presented evidence to negate defendant’s claim of self-defense beyond a reasonable doubt regarding the second degree murder of Mr. Williams. We further find that defendant failed to establish by a preponderance of the evidence that he acted in self-defense in the attempted second degree murder of Mr. Petty.
In addition, defendant included in his sufficiency argument' the following conclu-sory statements and complaints that: 1) the State improperly stated that Mr. Walker was a liar in its opening statement; 2) the State failed to call Mr. Walker as a witness, and instead offered police testimony as to Mr. Walker’s statements to the police; and 3) the trial court excluded Mr. Walker’s grand jury testimony. It is noted that defendant failed to include any case law to support his conclusions regarding these issues. Further, defendant also argued that the trial court excluded the victim’s prior bad acts against Ms. Durall, who was the topic of the argument between the victim and defendant.
First, during the State’s opening statement, the prosecutor explained that it would not be calling Mr. Walker as a witness because he was untruthful. When defense counsel objected, the State explained that it intended to present evidence that Mr. Walker was a liar. As a result, the trial court overruled the defense’s objection. After the prosecutor continued his opening statement and continued to comment on the veracity of Mr. Walker’s statements, defense counsel again objected. The trial court noted that the jury was instructed that the opening statement was not evidence and again overruled defendant’s objection.
In its opening statement, the State is allowed to set forth “the nature of the evidence by which the state expects to prove the charge.” La.C.Cr.P. art. 766. Also, it is well settled that the trial judge has wide discretion in controlling the | ¡..¡¡scope and extent of the opening statement. State v. Brown, 12-922 (La.App. 5 Cir. 12/12/13), 131 So.3d 207, 216. The record reflects that the trial court instructed the jury that the arguments made by the State and the defense are not evidence. The trial court further instructed the jury that the opening statement is not evidence. Therefore, the jury was sufficiently alerted that the opening statement was not evidence. Brown, swpra. Further, given the substantial evidence of defendant’s guilt, it is unlikely that the jury relied on the prosecutor’s comment that the absent witness provided untruthful statements to the officers in reaching their verdict. Therefore, we find that any such error would have been harmless. Brown, 131 So.3d at 216-17.
Second, defendant also complains that the State failed to present Mr. Walker as a witness, and instead offered police officers’ testimony concerning Mr. Walker’s statements. However, defendant failed to object to Mr. Bryson, a former officer, testifying regarding Mr. Walker’s statements to the police officers.[9] Defense counsel also cross-examined Mr. Bryson regarding Mr. Walker’s statements. Under La.C.Cr.P. art. 841, an irregularity or error cannot be availed of after a verdict unless it was objected to at the time of *994 occurrence. When the objection is not made timely, there is no ruling for the appellate court to review. See State v. Davis, 06-402 (La.App. 5 Cir. 11/28/06), 947 So.2d 48, 58, writ denied, 07-03 (La.9/14/07), 963 So.2d 996. In addition, it is noted that although Mr. Walker was not called as a witness by either party, Mr. Walker was subpoenaed by the defense and was present at trial on September 25, 2013. Therefore, Mr. Walker was not un-. der the State’s control.
It is further noted that a police officer, in explaining his own actions, may refer to statements made to him by other persons involved in the case. Such |9¿statements are admitted not to prove the truth of the assertion, but to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the officer. State v. Cowart, 01-1178 (La.App. 5 Cir. 3/26/02), 815 So.2d 275, 288, writ denied, 02-1457 (La.5/9/03), 843 So.2d 387; see also Davis, 947 So.2d at 56-57; State v. Cho, 02-274 (La.App. 5 Cir. 10/29/02), 831 So.2d 433, 447-48, writ denied, 02-2874 (La.4/4/03), 840 So.2d 1213.
Third, regarding the trial court’s exclusion of Mr. Walker’s grand jury testimony, defendant argues that Mr. Walker testified to the grand jury that he was coerced into identifying defendant by police officers stating that the victim’s family would retaliate against him. Defendant complains that the trial court denied his motion to suppress identification and prohibited any mention of Mr. Walker’s grand jury testimony. The record reflects that the trial court allowed the grand jury transcript to be released to defendant and conducted an in camera inspection of the transcript. During the February 22, 2013 motion to suppress identification hearing, the State objected to making any part of the grand jury testimony part of the record of the case and explained that the grand jury transcript was placed under seal for that purpose. The trial court disallowed the grand jury testimony into evidence and also denied defendant’s motion to suppress identification. Defendant failed to object to the court’s ruling and appeared to acquiesce to the ruling when defense counsel responded, “[o]kay.” “An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” La.C.Cr.P. art. 841(A); see also State v. Strickland, 11-715 (La.App. 5 Cir. 3/27/12), 91 So.3d 411, 418. Further, the record does not reflect that defendant filed any written motion regarding the use of the grand jury testimony as evidence. The record also does not reflect that defendant raised the issue of using the grand jury testimony as evidence at trial.
|2RMr. Petty also identified defendant in a photographic lineup and testified that defendant shot the victim. During the February 22, 2013 hearing, the trial court noted that there were other witnesses who identified defendant, and defense counsel responded that he was only referring to the identification provided by Mr. Walker.
Finally, defendant further argues that the jury was misled to believe that defendant was the aggressor because the trial court excluded the victim’s prior bad acts of physical violence against Ms. Du-rall, the woman who was the topic of the argument between the victim and defendant. The record reflects that the trial court granted the State’s motion in li-mine to exclude the victim’s prior bad acts, including Ms. Durall’s statements in a previous interview regarding the victim’s physical violence against her. Although defendant filed a written response, defense counsel failed to object to the trial court’s ruling and appeared to acquiesce by responding, “Yes, Your Hon- or.” “An irregularity or error cannot be availed of after verdict unless it was ob- *995 jeeted to at the time of occurrence.” La. C.Cr.P. art. 841(A).
Considering the foregoing, we find that the State presented evidence to negate defendant’s claim of self-defense beyond a reasonable doubt regarding the second degree murder of Mr. Williams. Further, we find that defendant failed to establish by a preponderance of the evidence that he acted in self-defense in the attempted second degree murder of Mr. Petty. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. TWO

Unconstitutionally excessive sentences

Defendant also argues on appeal that his sentences are “unconstitutionally excessive,” given that the evidence supported a finding that he acted in selfjdefense26 and that his actions were justified. Defendant contends that the imposed sentences of life and fifty years should be vacated because they are grossly out of proportion with the circumstances of this case.
The State responds that the evidence was sufficient to support that defendant did not act in self-defense. The State argues that circumstances of the case supported the sentences imposed, which were not excessive. The State further notes that the trial court had the discretion to impose consecutive sentences, but ordered the sentences to run concurrently.
Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence for the conviction of second degree murder of Mr. Williams. He was also sentenced to fifty years imprisonment at hard labor for the conviction of attempted second degree murder of Mr. Petty. These sentences were ordered to run concurrently. After imposition of the sentences, defense counsel objected to the sentences, and appellate counsel made an oral notice of intent to file an appeal. The record does not reflect that defendant filed a motion to reconsider sentence.
This Court has previously held that the failure to file a motion to reconsider. sentence limits a defendant to a bare review of his sentence for unconstitutional excessiveness. See State v. Ross, 13-924 (La.App. 5 Cir. 5/28/14), 142 So.3d 327, 333 (citing State v. Hunter, 10-552 (La.App. 5 Cir. 1/11/11), 59 So.3d 1270, 1272); State v. Holmes, 12-579 (La.App. 5 Cir. 5/16/13), 119 So.3d 181, 200, writ denied, 13-1395 (La. 1/10/14), 130 So.3d 318. Accordingly, we limit our review of defendant’s sentences to unconstitutional excessiveness.
The Eighth Amendment of the United States Constitution and Article 1, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense, or Ímposes needless and purposeless pain and suffering. Holmes, 119 So.3d at 200; Ross, supra (citing State v. Home, 11-204 (La.App. 5 Cir. 2/14/12), 88 So.3d 562, 569, writ denied, 12-0556 (La.6/1/12), 90 So.3d 437; State v. Wickem, 99-1261 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839). In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court’s sense of justice. Holmes, supra; see also Ross, 142 So.3d at 333 (citing State v. Lobato, 603 So.2d 739, 751 (La.1992)). The trial judge is afforded wide discretion in determining sentences, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. Holmes, supra; see also Ross, supra (citing La. C.Cr.P. art. 881.4(D); State v. Berry, 08-151 (La.App. 5 Cir. 6/19/08), 989 So.2d 120, 131, writ denied, 08-1660 (La.4/3/09), 6 *996 So.3d 767; State v. Pearson, 07-332 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 656).
“A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and therefore, is given broad disere1 tion in sentencing.” Holmes, 119 So.3d at 200; see also Ross, supra (citing State v. Cook, 95-2784 (La.5/31/96), 674 So.2d 957, 958 (per curiam), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996)). The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. Holmes, supra; see also Ross, supra (citing Pearson, supra; Home, 88 So.3d at 569).

Second degree murder

In the present case, defendant was convicted of second degree murder in violation of La. R.S. 14:30.1 (count one). Defendant’s life sentence is mandatory under La. R.S. 14:30.1(B), which provides that second degree murder is punishable Issby life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. It is presumed that a mandatory minimum sentence is constitutional. State v. Vedol, 12-376 (La.App. 5 Cir. 3/13/13), 113 So.3d 1119, 1125, writ denied, 13-811 (La.11/1/13), 125 So.3d 419. Nevertheless, even though defendant received the mandatory minimum sentence, that sentence may still be reviewed for unconstitutional excessiveness. To rebut the presumption of constitutionality, the defendant must show that: “[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances.” Vedol, 113 So.3d at 1125.
Where the defendant failed to present any evidence or make any argument regarding a downward departure from the mandatory minimum sentence at his sentencing hearing, this Court has found that the defendant failed to carry his burden and concluded that his sentence was not excessive. See Vedol, 113 So.3d at 1125; State v. Royal, 03-439 (La.App. 5 Cir. 9/30/03), 857 So.2d 1167, 1174, writ denied, 03-3172 (La.3/19/04), 869 So.2d 849. In the present case, defendant failed to present any evidence or make any argument regarding a downward departure from the mandatory minimum sentence at his sentencing hearing.
On appeal, defendant argues that his sentence is unconstitutionally excessive because the evidence supported that he acted in self-defense, and his actions were justified. However, as previously discussed, the evidence is sufficient under the Jackson standard to show that defendant had specific intent to kill or to inflict great bodily harm -when he fired the gun and shot Mr. Williams in the neck, and evidence negated defendant’s claims of self-defense. Defendant has argued no facts to support sc downward deviation from his mandatory minimum sentence of | ¡>¡)life imprisonment. Upon review, we find that defendant’s sentence for second degree murder (count one) is not unconstitutionally excessive.

Attempted second degree murder

Defendant’s conviction for attempted second degree murder is punishable by imprisonment at hard labor for not less than ten years nor more than fifty years without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:27(D)(i )(a). Therefore, defendant’s sentence for attempted second degree murder, although the maximum sentence allowed under the law, was within the applicable. sentencing range.
The imposition of a sentence, although within the statutory limits, may *997 still violate a defendant’s constitutional right against excessive punishment. Ross, 142 So.3d at 334 (citing State v. Scie, 13-634 (La.App. 5 Cir. 1/15/14), 134 So.3d-9, 12). In considering whether the trial court abused its discretion in sentencing a defendant, a reviewing court should consider 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentences imposed for similar crimes by other courts. See Holmes, 119 So.3d at 200; Ross, supra (citing Home, supra). The reviewing court must keep in mind that maximum sentences are reserved for the most egregious offenders. Holmes, supra; see also Ross, supra (citing Falkins, 880 So.2d at 911).
Jurisprudence, including sentences imposed in other courts, does not indicate that defendant’s maximum fifty-year sentence for attempted second degree murder was unwarranted. In State v. Stacker, 02-768 (La.App. 5 Cir. 12/30/02), 836 So.2d 601, writ denied, 03-411 (La.10/10/03), 855 So.2d 327, this Court noted that a firearm was used to shoot a victim at relatively close range and that the defendant pursued the victim as the victim attempted to flee, where the defendant fired two more shots with children present. After considering that multiple shots |snwere fired and the endangerment of the lives of others, this Court found that the defendant’s fifty-year sentence for attempted second degree murder was not excessive. See also Holmes, 119 So.3d at 200-01.
In State v. Ross, 42,399 (La.App. 2 Cir. 8/29/07), 965 So.2d 610, when the court found that the fifty-year sentence for attempted second degree murder was justified and not unconstitutionally excessive, it noted that serious physical injuries resulted from the drive-by shooting. Also, in State v. Sarpy, 10-700 (La.App. 3 Cir. 12/8/10), 52 So.3d 1032, writ denied, 11-46 (La.6/3/11), 63 So.3d 1006, when the Court found that the defendant’s maximum fifty-year sentence for attempted second degree murder and the imposition of life-sentence for second degree murder were not excessive, it considered the fact that the defendant committed the crime in conjunction with the second degree murder. See also Holmes, 119 So.3d at 201.
. In the present case, evidence was presented at trial that defendant opened fire from approximately two to three feet away into a vehicle while standing in a neighborhood street. Defendant then shot at Mr. Petty as he attempted to flee and continued firing multiple shots that endangered the lives of others. As a result, Mr. Petty sustained three gunshot wounds. Also, two children were cowering in a nearby vehicle, and at least one child witnessed the shooting. Further, defendant committed this crime in conjunction with the second degree murder of Mr. Williams.
Accordingly, we find that defendant’s sentences are not grossly out of proportion with the circumstances of this case. The sentences imposed were not unconstitutionally excessive, and the trial court did not abuse its discretion in the imposition of defendant’s sentences. This assignment of error is without merit.

ERRORS PATENT REVIEW

Defendant requests an errors patent review. This Court routinely reviews the record for errors patent in accordance with La.C.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337 (La.1975), and State v. Wei-land, 556 So.2d 175 (La.App. 5 Cir.1990), regardless of whether the defendant makes such a request.
The record reveals a conflict between the transcript and the “State of Louisiana Uniform Commitment Order,” which reflects the incorrect date of the offense. The Uniform Commitment Order incorrectly reflects the offense date as January 4, 2012, which appears to be the date *998 defendant was arrested. The record reflects that the offense was committed on January 2, 2012. Accordingly, we remand this matter for correction of the Uniform Commitment Order regarding the offense date and further direct the Clerk of Court to transmit the original of the corrected Uniform Commitment Order to the officer in charge of the institution to which defendant has been sentenced and the Department of Corrections’ legal department. See State v. Lyons, 13-564 (La.App. 5 Cir. 1/31/14), 134 So.3d 36 (citing Store v. Long, 12-184 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142).

CONCLUSION

For the foregoing reasons, defendant’s convictions and sentences are affirmed. This matter is remanded for correction of the Uniform Commitment Order as noted herein.

CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR CORRECTION OF THE COMMITMENT

. It appears that M.H. was referring to the shooter at this point, because the prosecutor had asked her to describe the actions of the shooter.

. Mr. Bryson testified that according to the crime cameras, the shooting occurred at 5:22:14 p.m. and the recording ended at 6:00 p.m.

. Dr. Troxclair also stated that she prepared an autopsy report, which included a toxicology report, which was negative for drugs or alcohol in Mr. Williams' urine or blood.

. Ms. Rauch also stated that the crime lab no longer performs gunshot residue tests because the tests only determine that a person was in close proximity when a gun was fired. She explained that approximately 80 per cent of gunshot victims test positive for gunshot residue although they never fired a weapon.

. In this statement, Ms. Durall says that she and Mr. Williams had broken up.

. The issue of whether the State or the defendant bears the burden of establishing that the defendant did not act in self-defense in a non-homicide case is unsettled in some circuits. See State v. Jones, 12-510 (La.App. 4 Cir. 6/12/13), 119 So.3d 859, 866; State v. Christof, 12-1995, 2013 WL 2484709, at *3 (La. App. 1 Cir. 6/7/13), writ denied, 13-1797 (La.2/14/14), 132 So.3d 410 (unpublished opinion) (citing State v. Taylor, 97-2261 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 931). Nevertheless, in the present case, under either standard, the evidence sufficiently established that defendant did not act in self-defense.

. The record does not reflect that Ms. La-garde testified that defendant was "ducking” as he ran. However, it appears that Ms. Lagarde demonstrated to the jury her observations of defendant’s actions as he ran.

. Although it appears that the trial court’s final instractions to the jury are not included in the record, the trial transcript does include the instructions that the trial court re-read to the jury after the jury requested to hear the definitions of the charges again.

. The defense objected to Mr. Bryson's testimony on the unrelated grounds that the prosecutor directed the witness and failure to follow proper procedure to refresh the witness with his police report.